James **BENJAMIN**, et al., Plaintiffs,

v.

William J. **FRASER**, et al., Defendants.

No. 75 CIV. 3073(HB).

United States District Court,
S.D. New York.

July 11, 2001.

**44.** *Strickland,* 466 U.S. at 694, 104 S.Ct.    2052; *White,* 174 F.3d at 294.

## SUPPLEMENTAL OPINION & ORDER

BAER, District Judge.

On April 26, 2001, this Court issued an order (the "April 26 Order") that directed: (1) the City of New York ("City") and the Department of Corrections ("Department") (collectively, "defendants") to take specific actions to remedy "current and ongoing" violations of federal law that this Court identified in 14 New York City jails [1] ("prospective relief") and (2) the Office of Compliance Consultants ("OCC") to monitor certain aspects of the prospective relief. Subsequent to the docketing of the April 26 Order, the parties separately sub-

---

1. The 14 facilities are: the Adolescent Reception and Detention Center ("ARDC"); the Anna M. Kross Center ("AMKC"), the George Motchan Detention Center ("GMDC"); the Rose M. Singer Center ("RMSC"); the James A. Thomas Center ("JATC"); the George R. Vierno Center ("GRVC"); the North Infirmary Command ("NIC"); Otis Bantum Correctional Center ("OBCC"); the Manhattan Detention Center ("MDC"); the Brooklyn House of Detention ("BKHD"); the Queens Detention Center ("QHD"); West Facility ("West"); the Vernon C. Bain Center ("VCBC"); and the Bronx Detention Center ("BXHD"). [The April 26 Order inadvertently omitted the last three facilities from the list of facilities in which this Court found constitutional violations. The April 26 Order is amended as provided infra by this decision.]

mitted motions for reconsideration of the April 26 Order which sought, *inter alia,* that the Court make: (1) an explicit ruling on whether the Prison Litigation Reform Act ("PLRA") forecloses the continuation of OCC;[2] (2) provision-by-provision determinations that the relief imposed was necessary, narrowly drawn and no more intrusive than necessary to correct the violation of the federal right in accordance with the language of the PLRA; (3) the modification or elimination of certain provisions of the April 26 Order; and (4) certain technical changes. For the reasons discussed below, plaintiffs' motion for reconsideration is granted in part and denied in part, defendants' motion for reconsideration is granted in part and denied in part. Further, the Court appoints John H. Doyle III as the new OCC Director.

## I. THE CONTINUATION OF OCC DOES NOT VIOLATE THE PLRA

Both parties request that the Court expressly decide whether OCC can coexist with the PLRA. Defendants argue that it cannot because the PLRA limits court-authorized agents to special masterships, whose appointment and responsibilities are specifically governed by the statute; plaintiffs disagree.[3] *See* 18 U.S.C. § 3626(f). Under the PLRA, a special master is appointed through a collaborative procedure between plaintiffs and defendants, and is confined to a limited set of activities, which does not include monitoring, the essential activity of OCC. *See* 18 U.S.C. § 3626(f).

"Limitations on powers and duties.—A special master appointed under this subsection—

(A) may be authorized by a court to conduct hearings and prepare proposed findings of fact, which shall be made on the record;

(B) shall not make any findings or communications ex parte;

(C) may be authorized by a court to assist in the development of remedial plans; and

(D) may be removed at any time, but shall be relieved of the appointment upon the termination of relief."

*Id.* Because OCC is a monitoring body, whose director is selected in a manner other than that which is statutorily prescribed, defendants argue that OCC is precluded by the PLRA.

Had the April 26 Order created rather than merely continued OCC, defendants' argument might be persuasive. OCC is not now, and never has been, a special master as defined by the PLRA. However, OCC is lawful in my view—not because, as plaintiffs initially argue, the PLRA's special master provisions leave intact the power of courts to appoint entities of a different stripe, like OCC[4]—but for the reason that OCC as a long extant organization is not subject to the subsequently enacted PLRA.

### A. The History of OCC

The instant opinion is the latest installment in a long line of decisions/orders

---

**2.** At the invitation of the Court, the parties briefed the issue of the applicability of the PLRA to OCC in March 2001. Those submissions form the basis of the Court's review of the status of OCC in this decision.

**3.** Defendants make a second argument—that OCC is subject to the PLRA requirements as an element of the prospective relief—which the Court discusses *infra* with regard to the

needs-narrowness-intrusiveness test of the PLRA.

**4.** Since the Court concludes that OCC is not subject to the special master provisions of the PLRA, I do not decide whether the special master provision might preclude courts from authorizing monitoring agents.

concerning OCC by this and other courts. In 1975, pretrial detainees in certain New York City jails brought seven related class actions alleging that the conditions of their confinement violated their constitutional rights. In 1978–79, the City and plaintiffs' counsel entered into consent decrees to address and remedy those conditions of confinement. In 1982, the consent decrees were consolidated for enforcement before the Honorable Morris E. Lasker who ordered, pursuant to the agreement between the parties, the creation of an agency called the Office of Compliance Consultants ("OCC") to monitor defendants' compliance with the consent decrees. Between 1982 and 1987, the parties consented to several renewals of OCC's mandate. Thereafter, it was continued by orders dated October 1987, September 1989, July 1991, January 1993, January 1995, January 1997 and September 2000. During the period 1982—2000, the Court periodically adjusted the scope of OCC's responsibilities, the intensity of its activities, and the nature of its operations.[5]

Contrary to the argument of defendants, OCC did not pass out of and come back into existence with each such order. Since 1982, OCC has performed essentially the same monitoring role over the same jail system in the same litigation. Moreover, the test of whether an entity is old or newly created is not whether the entity as it exists today perfectly resembles the entity of before. All entities change over time. Although OCC's authorization was for some years renewed by a series of orders with specified end dates, it was never the expectation of this Court that OCC would cease to exist on those dates, nor do I believe that is was the expectation of the parties. The sunset provisions built into the earlier OCC renewals did not anticipate the end of OCC without regard to the status of the litigation; rather, they (1) reflected the Court's expectations (repeatedly frustrated) that defendants would promptly comply with the consent decrees, and (2) provided a mechanism for the Court to actively supervise OCC, target its operations and provide its personnel some sense of the job's duration. Defendants' suggestion that such provisions bear out their claim that OCC has not been a continuous entity is plainly unjustified. Further, defendants' statements that "it is the sheerest artificiality to consider OCC to be a continuing monitor," (Def.s' memo re OCC, March 21, 2001 at 11), and that the OCC is "little more than a shell," *id.*, is at best, inaccurate and disingenuous. Defendants correctly point out that OCC's activities have been curtailed in recent years;[6] however, defendants fail to acknowledge that the reduction of OCC's activities ensued from defendants' legal challenge to the consent decrees and the Court's subse-

---

**5.** For example, the September 2000 order, *inter alia,* relocated OCC to Rikers Island to reduce costs and in recognition that OCC's activities had been temporarily reduced while the Court 1) prepared for and held the May 2000 hearings, as required under the PLRA where continuing constitutional violations are alleged, and 2) identified "continuing and ongoing" violations, which would define the scope of OCC's remaining mandate. Also by way of example, a December 1999 order directed OCC to conduct a thorough review of the jails in anticipation of the January 2000 hearings on fire safety, one of the discrete areas of prison administration addressed by the consent decrees. Lastly, the 1995 Order, which provided the most thorough description of OCC's responsibilities, reset the compensation of the OCC director to reflect then prevailing wage rates.

**6.** The Court's order of September 18, 2000 directed that OCC relocate from its unnecessarily large offices in lower Manhattan to Rikers island, partly in recognition that OCC's activities "have been greatly reduced," but also to create economic efficiencies and to make OCC more effective.

quent hearings, during the pendency of which OCC's activities had to be put largely on hold. Defendants' argument suggests the following: OCC ceased to exist because of defendants' unsuccessful litigation to escape the consent decrees and OCC's supervision thereof. I am not persuaded.

## B. Retroactivity: Application of the PLRA to OCC

█ To determine whether to apply a statute enacted after the events in suit, this court must determine whether Congress intended that the statute be retroactive. *See Landgraf v. U.S.I. Film Prod.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). If Congress did not clearly express its intent, I must conclude that the statute is not retroactive and therefore decline to apply the statute where so doing would have a "retroactive effect." *Id.* at 260, 268, 114 S.Ct. 1483 (noting the strong presumption against the retroactive application of statutes); *INS v. St. Cyr,* — U.S. —, 121 S.Ct. 2271, 2287–88, 150 L.Ed.2d 347 (2001) ("[r]etroactive statutes raise special concerns").

█ Few courts have analyzed whether and how the special master provisions of the PLRA apply to pre-existing court-authorized institutions.[7] *See Coleman v. Wilson,* 933 F.Supp. 954 (E.D.Cal.1996) (refusing to apply the PLRA's provision concerning the compensation of special masters to a previously appointed master); *Madrid v. Gomez,* 940 F.Supp. 247 (N.D.Cal.1996) (same). With respect to § 803(d)(3), a different provision of the PLRA that imposes caps on attorneys' fees, the Supreme Court held in *Martin v. Hadix,* 527 U.S. 343, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999), that § 803(d)(3) applies to cases that were pending when the

PLRA was enacted. In so holding, the *Martin* Court distinguished between fees earned for work performed prior to the PLRA's enactment and work performed thereafter. With respect to the latter, the Court found that "there is no retroactivity problem" since attorneys were on notice of the statutory fee structures. With respect to fees for pre-PLRA work, however, the Court concluded that § 803(d)(3) did not apply, since the section "does not clearly express congressional intent that it apply retroactively," *id.* at 354, 119 S.Ct. 1998, and because its application would have the retroactive effect of upsetting the reasonable expectations of the parties. *See id.* at 360, 119 S.Ct. 1998.

Regrettably, *Martin* is of limited application here. *Martin* concerned a different statutory provision and doesn't speak to the question of whether the continuation of a court-authorized monitor is precluded by the PLRA. *See generally Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483 ("there is no special reason to think that all the diverse provisions of the [Civil Rights Act of 1991] must be treated uniformly for such purposes"). However, *Martin* does indicate that the PLRA special master provisions do not have retroactive effect, because, like § 803(d)(2) at issue in that case, § 3626(f) contains no statement that Congress intended retroactive application and does not otherwise clearly express congressional intent to that effect. *See Martin,* 527 U.S. at 354, 119 S.Ct. 1998; *see also St. Cyr,* 121 S.Ct. at 2287–2288 ("[a] statute may not be applied retroactively, however, absent a clear indication from Congress that it intended such a result"). Indeed, the consistently prospective language of § 3626(f) (court "may appoint" a master; "shall appoint" a master; "shall request"

---

7. Most cases that discuss the retroactivity of PLRA provisions concern attorneys' fees sections which are separate and apart from those under consideration here.

**338**

lists from the parties) suggests a contrary intent. Thus, it is clear that § 3626(f) does not apply retroactively; what is less clear, however, is whether applying § 3626(f) to OCC would impermissibly cause a retroactive effect. Put another way, is it retroactive to limit OCC to a PLRA special mastership?

■ Defendants take the position that retroactivity is not an issue since the remedial order implicates only future conduct, and that whatever OCC has been to date, going forward it must hew to the PLRA line. *See Landgraf,* 511 U.S. at 273, 114 S.Ct. 1483 ("application of new statutes passed after the events in suit is unquestionably proper in many situations"). Plaintiffs, on the other hand, argue that (1) the prospective language of § 3626(f) clearly expresses Congress' intent that the provision not apply to ongoing entities like OCC, and (2) application of the special mastership would create a retroactive effect, because so doing would attach new legal consequences to past acts—i.e., the parties' agreement to settle the case, plaintiffs' agreement to forego enforcement litigation in favor of the informal process that OCC has monitored for many years, and this Court's decision to rely upon OCC. *See Martin,* 527 at 343, 119 S.Ct. 1998 ("[t]he inquiry into whether a statute operates retroactively demands a common sense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment") (quotations omitted).[8]

Plaintiffs' arguments are persuasive. By its terms, § 3626(f) refers to future events and does not apply to pre-enactment court authorizations. *See* § 3626(f) (court "may appoint" a master, "shall appoint" a master, "shall request" lists from the parties.) The prospective language of § 3626(f) stands in marked contrast to § 3626(a)(1) which explicitly provides for retroactive application. *See* § 3626, Note, Effective and Applicability Provisions ("provision governing "prospective relief" shall apply with respect to all prospective relief whether such relief was originally granted or approved before"). Congress' use of exclusively prospective language in defining masterships to assist in the remedial phase, juxtaposed with its explicit direction that a neighboring provision governing "prospective relief" be applied retroactively, indicates Congress' intent that the special masters provisions apply only to newly-created court authorizations. *See Lindh v. Murphy* 521 U.S. at 330–338, 117 S.Ct. 2059 (where Congress expressly provided for retroactive application in one provision of the AEDPA, silence in another provision created a "negative implication" that Congress intended prospective application when it had not expressly provided for retroactive application); *Ghana v. Holland,* 226 F.3d 175 (3rd Cir.2000) (holding that the "express language of § 1997e(a), which provides that 'no action shall be brought' until the prisoner exhausts administrative remedies, demonstrates Congress' intent that

8. "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result."

*Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483.

the exhaustion requirement apply only to new actions").

Moreover, even had § 3626(f) not indicated Congress' intent to the contrary, applying the special master provision to extant institutions like OCC would have an impermissible retroactive effect. OCC has been an integral part of the remedy here since soon after the commencement of this litigation, and to change its role at this late stage conflicts with settled expectations of both the parties and the Court. For this reason alone, precedent dictates that OCC continue without limitation by the PLRA. *See Landgraf*, 511 U.S. at 265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted"). In *St. Cyr*, the most recent Supreme Court decision on the subject, the INS argued that amendments to the immigration laws, which eliminated the right of immigrants convicted of certain crimes to seek waivers of deportation, did not have retroactive effect because the power to grant relief from deportation is "inherently prospective." *See St Cyr.*, 121 S.Ct. at 2292. The Court conceded that it had characterized deportation as "looking prospectively to the respondent's right to remain in this country in the future," *id.* (quoting *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984)), but rejected the INS' argument, reasoning that many immigrants had pleaded guilty and waived their constitutional right to a trial with the understanding that so doing would increase their chances of obtaining waivers of deportation in future INS proceedings. Here, plaintiffs entered into consent decrees with defendants, foregoing their right to proceed to trial, with the understanding that a court-authorized agent would monitor the jails until their deficiencies had been remedied. The ap-

plication of § 3626(f) to OCC would disrupt the settled expectations of plaintiffs and deprive them of the benefits they forewent by entering into the consent decrees.

My decision not to apply § 3626(f) to OCC is reinforced by the profound consequences that would follow were I to conclude otherwise. In *Martin*, the case upon which defendants principally rely, the issue was how much plaintiffs' attorneys should be paid for post-judgment monitoring work that they had already performed in a prison litigation. Although that issue implicated concerns of fairness to counsel, the Court's decision to award attorneys' fees calculated upon PLRA rates for work performed after the statute's enactment did not foreclose counsel's continued representation of his/her clients, alter the defining qualities of the legal relationships between the parties, or adversely impact the post-judgment monitoring being performed by plaintiffs' counsel. *Martin* was fundamentally a backward-looking decision which queried how much money was owing for work already performed and had little effect on future conduct, either in that case or in others. Here, as in *St. Cyr*, the issue is quite different than *Martin*. Because OCC is a monitoring body, and because monitoring is not permitted under § 3626(f), to label OCC a special master is to render unlawful an institution upon which this Court has relied in fashioning its approach to the litigation for many years. Nor is § 3626(f) akin to the jurisdictional statutes discussed in *Landgraf* which oust federal courts of jurisdiction, since, as the *Landgraf* Court itself observed, "[a]pplication of a new jurisdictional rule usually takes away no substantive right but simply changes the tribunal that is to hear the case." *Id.* at 274, 114 S.Ct. 1483. If OCC is ousted, nothing may replace it. The touchstone in *Landgraf*, *Martin* and *St. Cyr* of the retroactivity

analysis is whether applying the provision would attach legal consequences to prior events or relationships.[9] In my view, there is little that could alter the parties' and the court's relationship vis a vis one another and with OCC more than the termination of OCC's legal existence.

"The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id.* at 270, 114 S.Ct. 1483. And, "[a]ny test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have sound ... instinct[s]." (quotation marks omitted). *Id.* In accord with the approach suggested by the foregoing statements, a California district court held that fee limitations for special masters do not apply to special masters appointed before the PLRA.

"The transfer of the cost of the Special Mastership at this juncture not only imposes a substantial new burden on the judiciary for its previous decisions, but it also injects uncertainty into an on-going remedial process and alters its existing balance. . . . [T]here is clearly no guarantee that [federal] funds will continue to be forthcoming or will not be subject to restrictions that may significantly impair the Court's ability to effectuate full and effective relief. Of course any such impairment would also interfere with the plaintiffs' rights to such relief. Completely relieving defendants of any obligation to bear the cost of the Special Mastership may also undermine incentives to proceed efficiently and may even provide contrary incentives to delay." *Madrid,* 940 F.Supp. at 253–254. The court's concern in *Madrid,* that application of the PLRA would damage the on-going remedial process, is exactly the concern here.[10] There is no doubt that defendants will remedy the "current and ongoing" violations faster when monitored by OCC than if left to their own devices and that the departure of the OCC would have a immediate disruptive effect. Ironically, applying the statute to OCC would mean that defendants, who fought to vacate the consent decrees and failed because of continuing violations of constitutional minimums, lost the battle but won the war. They will have destroyed a long-standing monitoring institution that helped bring the light of day to those constitutional failures. It stretches credulity to believe that Congress intended such a perverse result.

In *Martin* the Supreme Court held that applying the PLRA fee provisions to work performed prior to the effective date of the statute would impermissibly alter the previously agreed upon fee arrangements. Informing the Court's holding, however, was the very real concern that application of a statute not cause "manifest injustice."

---

9. "The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.' " *St. Cyr,* 121 S.Ct. at 2290 (quoting *Martin,* 527 U.S. at 357–358, 119 S.Ct. 1998 which was in turn quoting *Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483).

10. Indeed, in their opposition to the continued operation of the OCC, defendants similarly characterized the court's concern in *Madrid.* "[Plaintiff's reliance] is further misplaced because those cases involved ongoing monitoring work where the application of new limitations and compensation standards would assertedly have had an immediate disruptive effect." Def.s' Br. Regarding Monitoring and the OCC, March 21, 2001, at 14.

*Martin,* 527 U.S. at 360, 119 S.Ct. 1998; *see also St. Cyr,* 121 S.Ct. at 2291 (focusing on "the potential for unfairness in the retroactive application of IIRIRA § 304(b)"). To eliminate OCC, it seems to me, would do precisely that.

## II. THE APRIL 26 ORDER COMPLIES WITH § 3626(a)(1)

The April 26 Order marked what I thought was the end to a lengthy process, throughout which the parties enjoyed extensive opportunities to make arguments to the Court and participate in the tailoring of the remedial order. On May 8–10 and May 15–17, 2000 ("May 2000 hearings"), I heard extensive testimony from present and former detainees, executives from the Department and experts about environmental conditions at the facilities. The Court issued an opinion on January 9, 2001 ("January 2001 opinion, 2001 WL 359488"), and a second on March 23, 2001 ("March 2001 opinion, 2001 WL 282705") (collectively, "environmental health opinions") that together partially granted the motion of defendants to terminate the environmental health provisions of the consent decrees. Sadly, in both opinions the Court found that many of the City's jails continued to have numerous "current and ongoing" environmental violations. In connection with the January 2001 opinion, the Court requested recommendations from the parties on how to remedy the "current and ongoing" violations identified in the opinion. The Court made a similar request in the March 22, 2001 opinion. In an effort to close the gaps between the parties' recommendations, the Court held a conference in Chambers, and later solicited jointly agreed upon text for the remedial order, as well as argument with respect to disputed language. On April 26, 2001, the Court issued the "Order On: Environmental Conditions," which incorporated much of the parties' agreed-upon provisions and took into consideration various concerns raised by one or both of the parties.

### A. PLRA: Needs–Narrowness–Intrusiveness

(1) Prospective relief.—(A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1).

On its face, the PLRA requires that before imposing prospective relief a court must find that such relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* Those courts that have construed this obligation have found that it is not sufficient to simply state in conclusory fashion that the requirements of the remedial order satisfy the statute; rather, district courts must make "particularized findings, on a provision-by-provision basis, that each requirement imposed by the [Order] satisfies the needs-narrowness-intrusiveness criteria, given the nature of the current and ongoing violation." *See Cason v. Seckinger,* 231 F.3d 777, 785 (11th Cir. 2000); *Ruiz v. United States,* 243 F.3d 941, 950–951 (5th Cir.2001); *Castillo v.*

*Cameron County,* 238 F.3d 339, 354 (5th Cir.2001). Plaintiffs urge this Court to depart from the holdings of these courts and adhere to the general rule that findings need only be "adequate to allow a clear understanding of its ruling." *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1058 (2nd Cir. 1992). Certainly, this Court's lengthy opinions and the April 26 Order more than suffice to "allow a clear understanding" of this Court's remedial order. Only an overdose of denial could suggest a lack of clarity as to what this Court determined was required to correct constitutional violations and why. Moreover, the prospective relief provided for in my April 26 Order is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right," *id,* all of which was either noted in my opinions or in the conferences with counsel.

I have grave doubts that the PLRA requires findings on a "provision-by-provision" basis. Notably, § 3626(a)(1) neither explains what it means for a court to "find" that relief is appropriate nor makes clear what portions of a remedial order "any prospective relief" refers to. It cannot be said that § 3626(a)(1) is unambiguous, or clearly expresses Congress' intent to depart from the traditional standard—findings sufficient to allow a "clear understanding" of the ruling—in favor of a painfully exacting standard under which courts make such findings on a paragraph by paragraph, or even sentence by sentence, basis. To interpret the PLRA to require more than a general finding that the prospective relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct

the violation of the Federal right," in my view, elevates formalism over substance and construes the PLRA as devising pitfalls for conscientious courts who have convened hearings, weighed extensive quantities of evidence, rendered detailed opinions, and drafted narrow and specific remedial orders. Requiring courts, in effect, to reproduce and expand upon all of their factual findings in a remedial order is duplicative, wasteful of judicial resources, and highly inefficient. Further, the asserted "factual findings" requirement is not an opportunity to relitigate "current and ongoing" violations, and should not be allowed to operate as such. Not surprisingly, and probably unavoidably, much of what the parties ostensibly submitted in connection with the "particularized findings" represents little more than an effort to regain what they lost at the hearing. However, in light of some, in my view, unfortunate appellate rulings, and to avoid yet more delay in the remediation of truly depressing environmental conditions, I will so proceed.

**B. OCC: Needs–Narrowness–Intrusiveness**

The April 26 Order consists of two discrete parts. The first sets forth the structure, resources and mandate of OCC; the second directs defendants to take specific remedial actions to correct current and ongoing violations. This latter section alone constitutes "prospective relief" within the meaning of § 3626(a)(1). OCC is exclusively a monitoring body, and monitoring itself, independent of the conditions to be monitored, cannot be relief. Monitoring merely informs the court and the parties where the defendants are in the process of providing the ordered relief. To find otherwise would conflate relief with the means to guarantee its provision.

Because the needs-narrowness-intrusiveness test of § 3626(a)(1) applies only with respect to "prospective relief," the Court need not make specific findings about OCC.[11] Thus, the Court shall not make specific findings with respect to OCC (¶¶ 1–10 of the April 26 Order), other than to observe that the nearly twenty year history of incomplete compliance with the consent decrees amply attests to the need for external monitoring, and that the April 26 Order (1) directs OCC to monitor only those conditions which this Court found to constitute "current and ongoing" violations in the environmental conditions opinions, (2) reduces the scope of OCC's monitoring from previous orders in recognition of the remedial work defendants have completed, and (3) provides OCC with limited resources that are sufficient only to carry out its narrow range of activities. My personal view is that a more robust OCC would substantially compress the time it takes to correct the constitutional violations, release this Court from its role and provide minimal standards for thousands of detainees. However, with an eye to the PLRA and in the interest of minimizing the burden on defendants, the April 26 Order preserved OCC's limited role.

## C. General Principles For Performing The Needs–Narrowness–Intrusiveness Test

The decision to engage in a provision-by-provision, needs-narrowness-intrusiveness analysis leads the court into uncharted waters. Neither the PLRA itself nor the appellate courts that have construed it provide guidance as to how, specifically, a court should go about finding that "relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." § 3626(a)(1). How many and what kinds of facts this Court needs to recite in support of its conclusion that a provision is PLRA compliant appears to be a question of first impression.[12] Thus, assuming that the PLRA requires a detailed needs-narrowness-intrusiveness analysis, a conclusion that I do not share, it seems essential to identify the principles implicit in the PLRA with respect to that analysis.

The court defines a "provision" for purposes of the "provision-by-provision" analysis as the paragraph or paragraphs of the April 26 Order that concern a specific environmental condition—i.e., sanitation, temp-

11. In so holding, I find to be relevant the decisions of those courts that have considered the question of whether a special master is prospective relief under the PLRA and have concluded that it is not. *See Casey v. Lewis*, No. Civ. 90–0054 PHX CAM, Order at 2 (D.Ariz., May 15, 1996) ("The appointment order is not prospective relief. Rather, it is a procedural mechanism for the court to implement the permanent injunction."); *Coleman v. Wilson*, 933 F.Supp. 954, 957 (E.D.Cal. 1996) (noting the distinction between the "ultimate form of the remedy" and the "means"); *Madrid v. Gomez*, 940 F.Supp. 247 (N.D.Cal.1996) ("[A] Special Master is simply a device utilized by the Court to assist in the formulation of appropriate relief or to monitor relief that is ordered. The appointment, however, is not itself relief."). Indeed, the statutory statements that "[i]n no event shall the appointment of a special master extend beyond the termination of relief" and that a master "shall be relieved of the appointment upon the termination of the relief" would make little sense if the special master was him/herself part of the relief. *See* § 3626(a)(1).

12. For example, does the court need to recite the findings of its prior opinions and of, in this case, the April 26 Order? After it finds a constitutional violation, how much explanation need the court provide as to why the ordered relief is narrowly drawn and the least intrusive? Does the analysis require different facts from those upon which the Court relied in finding current and ongoing violations?

erature, ventilation, heating, lighting, noise, and clinical and medical areas. A particular requirement does not lack for sufficient findings if the provision of which it is a part is amply supported. The PLRA provides only that "prospective relief" requires factual findings. It does not dictate that for every action required by a court (no matter how minor) there be a concomitant factual finding, nor is there any reason to believe that Congress intended such an onerous burden. Requiring factual findings for each type of relief is consistent with the language of the PLRA and satisfies Congress' desire that courts account for the necessity of the relief they order. Further, to conclude otherwise would either condition the adequacy of a court's findings upon the paragraph structure of the remedial order, or, at its logical extreme, force the court into the absurd position of having to make a separate analysis for every word in the order.

■ Agreements between the parties— as provided in the Proposed Order ("Prop.Order"), jointly drafted by the parties at the invitation of the Court—are evidence that those provisions incorporated into the April 26 Order comply with the needs-narrowness-intrusiveness analysis, and constitute the kind of findings arguably required by the PLRA. *Cf. Cason,* 231 F.3d at 785 n. 8 ("Of course, we do not mean to suggest that the district court must conduct an evidentiary hearing about or enter particularized findings concerning any facts or factors about which there is no dispute. The parties are free to make any concessions or enter into any stipulations they deem appropriate.") While the fact of agreement in the Proposed Order may not be sufficient to establish that a provision incorporated in the April 26 Order meets the needs-narrowness-intrusiveness test, it constitutes

strong evidence to that effect. Similarly, the existence of a Department policy that either resembles a requirement in the April 26 Order or, if taken at face value, renders the requirement redundant, does not militate against the necessity of such requirement. Prospective relief is necessary where conditions fall below constitutional minimums, whether or not such conditions would exist if defendants observed their own rules. Indeed, rather than evidencing that a court-imposed requirement is not compliant with the PLRA, the fact of an applicable Department policy attests to narrowness and unobtrusiveness of that requirement. Requiring the Department to follow its own rules can hardly be either too broad or too intrusive.

With regard to objections to temporal deadlines—as opposed to the relief itself— to the extent that deadlines require "prospective relief" findings at all, the Court cannot determine that a deadline is other than narrowly drawn and unobtrusive unless defendants proffer clear counter-arguments and alternative dates. Defendants object that this approach as an impermissible shift of the needs-narrowness-intrusiveness burden to them, but such an objection misses the essential point that by providing defendants any time at all to implement the ordered relief the Court allows defendants to further trespass on detainees' constitutional rights. Contrary to what appears to be defendants' view, the Department's pre-existing, internally-generated renovation schedules are not the measure of whether a deadline complies with the PLRA. If defendants want to delay the remedy beyond the dates assigned by the Court—after considerable input from defendants—it is incumbent upon defendants to provide a good reason. That defendants had already intended to perform the ordered work but according to

a different timeframe does not constitute a good reason.

## D. Provision–By–Provision Findings

**Sanitation** (¶ 11, 13 of the April 26 Order)

■ In the environmental health opinions,[13] I found that the sanitation at AMKC (except for the medical areas), ARDC, GMDC, RMSC, JATC, GRVC, NIC, OBCC, MDC, BKHD, QHD, West, VCBC, and BXHD fell far below constitutional minimums. The Court directed in ¶¶ 11 and 13 of the April 26 Order, as amended by this decision, that defendants take certain actions to achieve minimum constitutional standards at the 14 facilities.[14] Those actions, which are necessary to cure the constitutional violation, narrowly drawn, and as unobtrusive as possible, are to:[15] (a) clean and sanitize various hygiene and sanitation facilities at least once per day and power wash the showers with a bleach solution once per quarter; (b) complete shower replacement by August 1, 2002; (c) clean and sanitize living areas once per week; (d) clean cells upon vacancy; (e) clean and sanitize mattresses between uses by different detainees; (f) provide a ventilated janitor closet with supplies and store cleaning implements in places that are clean and ventilated and (g) provide detainees with food storage containers.

### (a) personal hygiene and sanitation facilities; power washing of showers

Defendants object only to the power washing portion of this requirement. However, in light of this Court's finding that "[s]oap scum and mildew were observed in many showers ...," January 2001 opinion, 2001 WL 359488, *26, and defendants' representation that power washing is "[g]enerally done once every couple of months (T840)," id., requiring quarterly power washings with bleach is, if anything, overly narrow and unobtrusive. Defendants' objection that power washing may damage tiling is not an excuse to forgo basic hygiene, but rather additional

**13.** The January 2001 Opinion found:

"[T]he cumulative evidence of soiled light shields, dirty or clogged ventilation registers, vermin activity, mildewed and decrepit bathroom and shower areas, clogged toilets, dirty janitor's closets, shortages of laundry detergent, and dirty prison cells in combination constitutes a clear deprivation of adequate sanitation in the Department's jails. (See Pl.Ex. 106 & 107 passim); (Pl. Ex. 365 & 366 passim). In addition, Director Feeney's April Report highlights a number of sanitation problems: ARDC: smoke-stained walls in the majority of cells; AMKC: smoke-stained walls in housing areas; GMDC: 'modular units and showers present a sanitation problem' (Def. Ex. F–1 at 16); QHD: with regard to housekeeping, 'the facility must pay more attention to detail in the housing areas' (Id. at 22); GRVC: '[T]he facility must focus more carefully on sanitation. Soap scum and mildew were observed in many showers .... [I]n Building 1A ... [o]ld food trays, paper, and rotted fruit were observed in many cells.' (Id. at 24–25.)"

Id. at *26. Similarly, the March 2001 opinion stated:

"Feeney's notes and testimony as well as other record evidence also clearly attest to the severe sanitation problems at NIC at the time of the two experts' visit to NIC in March, 2000. (See Pl. Exh. 366, at E06679–88; Tr. 959–968; Def. Exh. F–46 at E01758, 1813–4, 1822, 1853–54, 1906 (sanitarians' reports of NIC intake from August until November 1999))."

Id. at *4.

**14.** The April 26 Order inadvertently omitted West, VCBC, BXHD from the list of facilities at which the Court found unconstitutional sanitation. That omission is corrected *infra* in this opinion.

**15.** The following merely summarizes the requirements of ¶¶ 11 and 13. For the precise directions of the Court see the April 26 Order.

evidence that the bathrooms are falling apart.

### (b) shower replacements

In many cases, the conditions of the bathrooms are so desperate as to make replacement the only viable means to achieve constitutional standards. *See* Pl. Post–Hearing Brief Re: Environmental Health and Related Issues, at 59–66 (which findings the Court adopts). As of the May 2000 hearings, defendants had begun a long term shower renovation project, involving: roof repair; replacement of showerheads, water and drainage lines; and installation of new walls, ceilings and mechanical ventilation. In connection with such projects, and in an effort to devise a remediation strategy consistent with defendants' ongoing efforts, the April 26 Order required defendants to "submit a complete list of the shower replacement schedules to OCC by July 2, 2001, with completion dates for the work, which dates shall not extend beyond August 1, 2002." April 26 Order, ¶ 11b. Defendants, who agreed in the Proposed Order to the submission of "a complete list of shower replacement schedules," (Prop. Order at 8), characterize this deadline as not achievable, and request an extension of 1.5 years until January 30, 2004. This Court has no desire to impose unrealistic deadlines upon defendants, but defendants do not establish the necessity for a 1.5 year extension by claiming that August 1, 2002 is too soon and asserting that the Department's existing plans call for a longer schedule. Strangely, here and in other temporal aspects of the remedial order the defendants appear to believe that the Department's existing plans to be my guide. They are not! Given this Court's finding that the conditions of the showers are unconstitutional, I do not have the flexibility to accommodate defendants' preferences while detainees are subject to unconstitu-

tional conditions. Nor, I might add, should the City be willing to countenance such a state of affairs in its prisons.

### (c) cleaning living areas

Due to the evidence of widespread failure to observe basic sanitation practices, (January 2001 Opinion, 2001 WL 359488 *25–26), it is necessary for the Court to adopt a general rule that defendants must clean living areas once per week. Defendants have made no substantive objection to this requirement, which goes no further than to insist on basic sanitary practices. Moreover, since a Department policy already imposes a similar obligation, this requirement merely makes it a contempt of Court for defendants to fail to follow their own procedures. *See id;* Def.s' Post–Hearing Memorandum, at 67.

### (d) cleaning cells upon vacancy

In the Proposed Order, defendants agreed that cells "shall be thoroughly cleaned upon becoming vacant," but objected to plaintiff's proposal, subsequently adopted by the Court in the April 26 Order, that the Court identify those activities that define a "thorough cleaning." Prop. Order at 10. Defendants' objection is misplaced. The mandated activities are not mere elaborations of the "thorough cleaning" requirement, but follow directly from the Court's findings, as set forth in the environmental conditions opinions, and reiterate requirements imposed elsewhere in the Order. For example, the activity of "repairing or replacing damaged or obscured light shields," (April 26 Order ¶ 11d) derives from the "evidence of soiled light shields," *id.* at *26, and exists as a free-standing requirement under ¶ 17e of the April 26 Order. Similarly, the requirements that mattresses be sanitized or replaced are the necessary corollaries of the obligation to provide detainees with sanitized mattresses in good repair. *See* April

26 Order ¶ 11e. Given defendants' agreement that cells should be cleaned, and their agreements in other portions of the Proposed Order that mattresses should be sanitized, light shields and ventilation registers cleaned, and radiators repaired, it is self-evident that the ordered relief is not excessive or intrusive.

### (e) mattresses

In holding that unsanitary conditions in the jails violated detainees' constitutional rights, the Court found "that detainees are routinely exposed to unsanitary mattresses, which poses a direct risk to health." January 2001 opinion, 2001 WL 359488 *26. Sanitizing and/or replacing mattresses after use by one detainee and before use by another is the only means to stop the spread of germs and the growth of bacteria. During my April 2001 visit to Rikers Island, I noted that the overwhelming majority of mattresses were either uncovered, torn or soiled. My own admittedly unscientific findings are entirely consistent with the testimony of Dr. Powitz at the May hearings. *See id.;* May 2000 hearings, T646. This narrowly defined requirement is not intrusive; indeed the Department's own housekeeping manual and states that any mattresses with holes, rips, or tears should be replaced. *See* DX F–29 at 6510.

### (f) janitor's closets; (g) food storage containers

Defendants have made no objections to these requirements, which go no further than to require defendants to engage in basic sanitary practices, which they claim to do already and profess an intent to continue.[16] In the Proposed Order, the parties agreed to both of the requirements. *See* Prop. Order at 12–13. Indeed, the Court adopted defendants' version of ¶ 11g concerning janitor's closets because plaintiffs' proposal that the Court specify the kinds of supplies the closet must include was insufficiently narrow and unduly intrusiveness. *Id.*

**Temperature** (¶ 14 of the April 26 Order)

This Court found that class members are subject to unconstitutional extremes of temperature at AMKC, ARDC, BKHD, GMDC, GRVC, JATC, NIC, QHD, OBCC, and RMSC. *See* January 2001 Opinion, 2001 WL 359488 *13–18. Thereafter, the Court directed in ¶ 14 of the April 26 Order that defendants implement a monitoring program devised to be as narrowly drawn and unobtrusive as possible at the above-listed facilities.[17] The parties agreed on most aspects of such a program.[18] Where they disagreed, the Court

16. The Court stated in the January 2001 opinion:

> Dr. Powitz testified that housing area janitor's closets, in which cleaning equipment is stored, are not kept clean. (Tr. 660, 662–663.) According to Dr. Powitz, mops and other equipment—basic items used to clean the rest of the detainee living areas—were "heavily soiled." (Tr. 660.) "Dr. Powitz told the Court that 'Janitor closets probably were the dirtiest areas within any [jail housing] block.... Some were clean, but many were not.... The janitor's areas, or the closets, are the work areas for housekeeping, and generally should be the cleanest within a facility.... [T]his is where you start, with clean equipment, clean chemical, clean water, and to go out to affect [sic:effect] housekeeping.... Start off clean, you are going to end up clean.' And janitor's closets are critical to that.' (Tr. 662–663.)"

> *Id.* at *26.

17. The Court adopts as its own the findings included in plaintiffs' post hearing brief re: environmental health and related issues as set forth in pages 30–40.

18. Prior to the April 26 Order, there was no comprehensive system for identifying temperature problems.

generally acceded to defendants' requests and so conformed the relevant provisions of the April 26 Order. Thus, the Court (1) adopted defendants' view about when testing should occur (in the parlance of the April 26 Order, "testing days"); (2) required that 40%, as opposed to plaintiff's request of 100%, of the modular and sprung housing units be monitored on testing days; and (3) limited testing personnel to the OCC–EHOs, and did not permit OCC to use "designees" from the Department (as plaintiffs proposed) unless the OCC–EHOs prove unable to complete the monitoring and the Court approves a staff enhancement plan that includes "designees." *See* April 26 Order ¶ 14; Prop. Order at 16–19.

In any event, since the temperature monitoring program is "monitoring" to be coordinated by OCC, as opposed to "prospective relief," ¶ 14 is not subject to the needs-narrowness-intrusiveness test. *See supra* section re "OCC: needs-narrowness-intrusiveness."

**Ventilation** (¶ 15 of the April 26 Order)

Inadequate ventilation constitutes a "current and ongoing" violation because the absence of ventilation—the supply of fresh air and the exhaust of impure air—carries significant, adverse health consequences. *See* January 2001 opinion, 2001 WL 359488 *6–7; March 2001 Opinion, 2001 WL 282705 *2. In the wake of this finding, the Court directed in the April 26 Order that defendants take certain narrowly drawn actions, constituting the least intrusive means to correct the violations, at ARDC, GMDC, GRVC, JATC, MDC, NIC, OBCC, the mental observations units at AMKC, RMSC, and the intake areas at QHD and BKHD.[19] Specifically, the Court

required:[20] (a) annual inspection and balancing of ventilation systems; (b) completion of those repairs necessary to restore functional ventilation by dates certain, including repairing the roof fans at ARDC by July 31, 2001; (c) adequate ventilation in bathroom and shower areas; (d) spacing beds such that the heads of sleeping prisoners are at least 6 feet apart; (e) operational windows; and (f) information about ventilation problems in intake areas.

*(a) annual inspection and balancing of ventilation systems*

With respect to the annual testing requirement, defendants objected that their inspection schedule for heating and cooling systems, which are included in Directive 3900, is sufficient. *See* Prop. Order at 23. In fact, Directive 3900 concerns only heating systems and does not address ventilation or cooling systems at all; and, in any event, the pre-existence of a directive that required defendants to test heating systems would only affirm the compliance of this Court's requirement with the PLRA. *See* Defendants' Exhibit F–20 at 14. Defendants do not otherwise object to the requirement that ventilation systems be inspected, tested and repaired before May 15 of every year, but they do object to the requirement that mechanical ventilation systems be balanced annually, alleging that this is not generally done in the industry and that ventilation systems are balanced only when they are installed. *See* Declaration of Vincent Clara in Support of Def.s' Motion For Reconsideration, ¶ 19. However, testimony to the contrary by Deputy Commissioner Tsu (May 2000

---

19. The April 26 Order inadvertently referred to the intake areas of MRSC only. This Order, *infra,* corrects that omission.

20. The following merely summarizes the requirements of ¶ 15. For the precise directions of the Court see the April 26 Order.

hearings, T1213)[21] and Dr. Powitz, plaintiffs' expert, (*id.*, T485–86) is more persuasive than the affidavit of Vincent Cara.[22] Moreover, the April 26 Order expressly provides that rebalancing need not be done annually if the manufacturer's specifications dictate a different schedule. Defendants have not alleged that annual balancing is unduly burdensome.

### (b) completion of repairs necessary to restore functional ventilation by dates certain

Defendants objected to the requirement that ventilation repairs be completed before July 1, 2001. However, they did not propose an alternative date, nor did they submit the inventory of such repairs that they promised on April 15, 2001, which they said was necessary to assess the time required for completion. *See* Prop. Order at 24.

### (c) adequate ventilation in bathroom and shower areas

This requirement, agreed to by the parties in the Proposed Order (*see* Prop. Order at 24), is an expression of the general requirement that defendants provide adequate ventilation in all jail areas. It is included here as an independent item in the April 26 Order in recognition of the calamitous state of many of the bathrooms (to a large degree as a result of poor ventilation) and shower areas, some of which I have personally visited. *See* January 2001 Opinion at *82 (describing mildewed and decrepit bathroom and shower areas). In many jails, poor or no ventilation in shower rooms causes such unrelieved humid conditions that showers grow mold and deteriorate, tiles fall off the walls and dislodge from the floor, paint peels off of walls and ceilings and metal framing rusts away. *See* PX 123, 126, 132, 133, 134, 137–141, 145, 153, 164–67, 170–72, 176–185, 198–191.

### (d) bed spacing—heads 6 feet apart

Plaintiffs' environmental expert, Dr. Powitz, testified that beds should be placed such that prisoners' heads are 6 feet apart because droplets emanating from one person's mouth remain airborne for at least three feet but generally not as far as 6 feet. *See* Tr. 690–91. Upon this and other uncontradicted testimony,[23] the Court determined that defendants' failure to so space its beds was a "current and ongoing" violation. There is no need to make further findings about this requirement of the April 26 Order, because the requirement is by definition necessary to correct the violation. Defendants agreed to this requirement in the Proposed Order, and only later raised an objection to the 6 foot standard. *See* Prop. Order at 24. Defendants also object to the July 2, 2001 dead-

---

21. Mr. Tsu is a Deputy Commissioner in the New York City Department of Design and Construction, and has both a B.A. degree and an M.A. in Architecture. At the May 2000 hearings, Mr. Tsu described his position with the City as "an urban designer," and as such supervises design and construction projects for city agencies, including the Department of Corrections. *See* May 2000 hearings, T1195.

22. Mr. Cara "is responsible for maintenance of the physical plant" at Rikers. *See* May 2000 hearings, T1084. Mr. Cara's affidavit appears to echo testimony that he gave in a deposition taken prior to the May 2000 hear-

ings, but that was neither submitted as an exhibit nor elicited on direct examination at the May 2000 hearings.

23. Government regulations addressing bed-spacing in other dormitory settings require that there be 3 feet between beds (or 6 feet between heads). *See* 24 RCNY Hlth.Code § 48.15(h)(2) (requiring 6 feet between heads of sleepers in summer camps); 29 C.F.R. § 1910.142 (requiring that beds in temporary labor camps not be spaced closer than 36 inches).

line for the implementation of the 6 foot standard because achieving the standard would require moving beds, and the beds are bolted to the floor. While it may be that this is labor-intensive, it is also true that moving beds, as opposed to detainees, for example, is but one means to achieve the 6 foot standard.[24] Defendants protest that there are limited available bed spaces to which detainees could be moved, but I note that the population at Rikers has contracted substantially in recent years, thereby freeing up bed spaces. Also, defendants' proposal (with regard to a different provision of the April 26 Order), that temperature violations be corrected by moving detainees from living areas that are too hot or too cold, further indicates that there are available living areas that could be used to spread out detainees.

### (e) operational windows

Operational windows are necessary for ventilation and temperature control. (*See* findings re ¶ 16 *infra* regarding the importance of functioning windows in temperature regulation). There is ample evidence that non-functioning windows contribute to inadequate ventilation and excessive heat. *See* T129–30 (Thompson); T77 (Browne); T549, T553, T558 (Powitz); PX 106 at P00049 (Powitz notes); PX 365 at 15 (Feeney notes). This requirement is not overly intrusive, since it requires only that defendants repair non-functioning windows, a routine task in any building. Defendants object on the grounds that (1) defendants may have to replace rather than repair certain windows, (2) a complete repair/re-

placement program is not the least intrusive relief because a single broken window is not a constitutional violation,[25] and (3) the relief appropriate to the Court's finding of unconstitutional temperature is to direct defendants to move detainees out of housing areas where temperatures are either too hot or too cold. Defendants' first argument fails because operable windows are necessary to avoid temperature extremes, and the PLRA does not excuse defendants from necessary, if expensive, repairs. Defendants' second argument is equally unavailing because a comprehensive repair program is the only rational means to correct the system-wide violation, and is far less intrusive than the Court making window-by-window repair/replace determinations. Defendants' final argument is also unacceptable because the evidence convinces me that defendants would not be sufficiently responsive to changes in housing area temperatures and because, if fully implemented, such a program would be more intrusive and burdensome on defendants than the ordered relief.

### (f) information about ventilation problems in intake areas.

Defendants make no objection to the requirement that they provide "information about the frequency and causes of malfunctioning or non-functioning mechanical ventilation in intake areas, as well as the amount of time it takes to restore fully functioning ventilation in various foreseeable circumstances." April 26 Order ¶ 15f. Intake areas often hold detainees who

---

24. Clearly, defendants would comply with the 6 foot standard if detainees occupied only every other bed in living spaces in which beds are packed in tightly.

25. *See* Def.s' Br. in oppo. to Pl.'s motion for add'l findings, at 11 ("It is not necessarily the case that a single non-operative window cre-

ates constitutionally deficient conditions in a housing area.... For example, a single window in a dayroom or modular unit that is stuck open a crack in mild weather will not cause unconstitutional conditions in that area.")

have just been admitted to jail and have not yet been medically screened for infectious diseases. They are extremely crowded at times of high traffic in and out of the jail. Functioning ventilation is therefore particularly important in intake areas "to reduce the infectious burden on those coming through the system ... [where] you want dilution ventilation as much as humanly possible." T651 (testimony of Dr. Powitz).

**Heating** (¶ 16 of the April 26 Order)

The Court found that class members are subject to unconstitutional extremes of temperature at AMKC, ARDC, BKHD, GMDC, GRVC, JATC, NIC, QHD, OBCC, and RMSC, *See* January 2001 opinion, 2001 WL 359488 *13–18. To give effect to this finding, the Court directed defendants in ¶ 16 of the April 26 Order to take certain actions, which are narrowly drawn and the least intrusive means to remedy the identified heating violations. Specifically, ¶ 16 requires that defendants: [26] (a) annually test heating systems and certify that they are in full repair by October 15 of each year; (b) maintain radiators and radiator covers in good repair; and (c) prior to the end of winter ensure that windows are fully operational, repair broken windows promptly, and not house inmates in cells or dormitory areas during winter months where the windows are broken or cannot be closed or sealed. The factual findings applicable to the temperature monitoring provision (¶ 14 of the April 26 Order, as discussed *supra*) are equally applicable to the heating provision as they derive from the same temperature regulation problem.

*(a) annually test heating systems and certify that they have done so*

Defendants make no objection to annual testing of heating systems and state that such inspections already take place, but do object to the October 15, 2001 deadline to complete repairs of windows that do not close. Since the heating season is now well over, an October 15 deadline affords time enough to make repairs. Further, since the deprivation of warmth to detainees is a constitutional violation (January 2001 Opinion, 2001 WL 359488 *13), and considering that after October 15 temperatures at Rikers island, which is a harsh, environmentally exposed environment, are likely to drop quickly, extending defendants' deadline would be a license to subject detainees to unconstitutional conditions for yet another winter.

*(b) maintain radiators and radiator covers in good repair*

The parties agreed to this requirement in the Proposed Order (*see* Prop. Order at 27) and is made necessary by the findings with respect to "a" above.

*(c) windows must be unbroken and fully operational*

Defendants object to the requirement that windows be operational during the winter, on the grounds that it is sufficient for them to be closed and sealed to maintain proper temperatures. However, because there was substantial evidence of excessive heat during the winter, keeping the windows operational is necessary to protect detainees from temperature extremes. Of this need, I can personally attest. Certain of the modular units that I visited in early April 2001 (during the Department's "heating season") were sweltering, despite the open windows all around. Had those windows been sealed, the de-

---

26. The following merely summarizes the requirements of ¶ 16. For the precise directions of the Court see the April 26 Order.

tainees, many of whom were stripped to their waists, would have been at considerable medical risk.[27] Defendants also objected to the requirement that prisoners not be housed during the winter months in living areas where windows cannot be closed or sealed or windowpanes are broken. *See* Prop. Order at 28. This requirement necessarily follows from the holding that the Constitution protects detainees from exposure to extreme temperatures and the determination that detainees housed in cells with broken windows are often exposed to extreme cold.

**Lighting** (¶ 17 of the April 26 Order)

The Court found that detainees are subject to constitutionally inadequate lighting at all of the defendants' jails, with the exceptions of ARDC and AMKC. *See* January 2001 opinion, 2001 WL 359488 *27–31. In so holding, the Court found that "[i]nadequate lighting in the Department's jails can be traced to several problems (1) non-working light fixtures (2) inadequate light bulb wattage and (3) obstructed light shields." *Id.* at *28. In light of that finding, the Court directed defendants in ¶ 17 of the April 26 Order to take certain actions which are narrowly drawn and the least intrusive means to correct the violations. Specifically, the Court directed defendants to:[28] (a) ensure that 20 foot-candles of light be provided at bed or desk

level in all cells and dormitories at GMDC, RMSC, JATC, GRVC, NIC, OBCC, MDC, BKHD and QHD; (b) ensure that in the medical areas of GMDC, NIC and RMSC there be no less than 30 foot-candles of general lighting and 100 foot-candles of task lighting in specific, functionally defined areas; (c) implement the foot-candle standards by a date certain; (d) identify and clean all light shields by a date certain; and (e) not house prisoners in cells with lights that do not work.

*(a) 20 foot-candle standard*

In the January 2001 opinion, the Court held that 10 foot-candle lighting in cells and dormitories is constitutionally inadequate, but deferred the determination of whether a 20 or 30 foot-candle standard is necessary to remedy the violations. *See* January 2001 opinion, 2001 WL 359488 *27 ("[t]he inadequacy of the 10 foot candle standard is made plain by the fact that the Department endorsed an upgrade from 20 foot candles to 30 foot candles in 1993").[29] It is the Court's view that the adoption of a foot-candle standard is necessary and the least intrusive means to give effect to the Court's holding. In the April 26 Order, over plaintiffs' objections the Court directed defendants to adopt the lesser 20 foot standard despite the Court's significant

---

**27.** The Court adopts as its own the finding of Dr. Powitz, as summarized in "Appendix 5" of plaintiffs' "post-hearing brief re: environmental health and related issues," that living areas at facilities he visited during winter months were extremely hot.

**28.** The following merely summarizes the requirements of ¶ 17. For the precise directions of the Court see the April 26 Order.

**29.** "Plaintiffs argue that '[t]en foot candles is, in fact, quite a dim light for purposes of activities such as reading, grooming, and letter-writing.' (Pl. Mem. at 94.) This Court agrees. The inadequacy of the 10 foot candle standard is made plain by the fact that the

Department endorsed an upgrade from 20 foot candles to 30 foot candles in 1993. While this Court will not decide here which standard is appropriate, it is clear that all but a few Department facilities are dimly lit and thus provide constitutionally inadequate lighting.

> Inadequate lighting in the Department's jails can be traced to several problems: (1) non-working light fixtures (2) inadequate light bulb wattage and (3) obstructed light shields (also referred to as luminary covers)."

January 2001 Opinion, 2001 WL 359488 *28.

reservations about its sufficiency. *See* April 26 Order ¶ 17a. Further, rather than directing the Department to install bulbs of a particular wattage, the Court confined its ruling to the less intrusive requirement that prisoners must have 20 foot-candles of light at desk or bed level. It is within defendants' discretion how to achieve that standard. *See* Prop. Order at 30–31.

*(b) lighting in medical areas*

The April 26 Order requires 30 foot-candles of general lighting and 100 foot-candles of task lighting in areas where patients are examined or medication is stored, prepared, dispensed or otherwise handled. *See* April 26 Order ¶ 17b. In the Proposed Order, plaintiffs' sought 50 foot-candles of general lighting and 100 foot-candles of task lighting based upon Dr. Powitz's testimony and the Standards of the Illuminating Engineer Society of North America. *See* Prop. Order at 34; T611–615; PX 103. Defendants objected to the 50 foot-candle standard and instead recommended the OSHA standard of the 30 foot-candle standard. Although the Court has reservations about the adequacy of the 30 foot-candle standard in medical facilities, the April 26 Order adopted defendants' proposal so as to ensure that defendants' obligations did not exceed constitutional minimums. Defendants also favored a 90 foot-candle standard for task lighting, but the Court determined that the 100 foot-candle standard is constitutionally imperative given the safety risks posed by inadequate light in patient treatment areas. *See* Prop. Order at 34 ("Defendants ... would accept a standard of 90 ft.cd. for task lighting"). Moreover, even if 90 foot-candles of task lighting meets minimum standards, which I do not believe is the case, the additional 10 foot-candles of lighting does not render the 100 foot-candle unduly broad or intrusive.

*(c) implementation deadlines*

The April 26 Order directed defendants to implement the foot-candle standards by August 1, 2001 except to the extent that capital renovations are required. *See* April 26 Order ¶ 17d. Defendants object on the ground that meeting the 20 foot-candle standard will require painting cell walls and taking other time intensive actions; however, defendants could meet the standard by installing higher wattage bulbs and, in any event, have provided no reason why three months is insufficient time to apply a coat of paint or hit upon some other means to enhance lighting. Defendants' further objection—that the August 1, 2001 deadline poses particular problems at BKDC, QDC and JATC where capital renovations may be required—is misplaced since the April 26 Order obliged defendants only to identify capital renovations by August 1, 2001 (for completion by January 3, 2002).

*(d) identify and clean all light shields by a date certain*

In the January 2001 opinion, the Court found that constitutionally inadequate lighting was, in part, traceable to obstructed light shields. *See* January 2001 opinion, 2001 WL 359488 *28. Defendants object to the imposition of any completion date for identifying and cleaning or replacing light shields that are discolored, painted over, or obscured, on the sole ground that this responsibility is ongoing and any completion date is inappropriate. *See* Prop. Order at 32–33. The defendants have missed the point. The completion date of August 1, 2001 refers to an initial system wide cleaning and replacement effort. *See* April 26 Order ¶ 17d. The second sentence of the paragraph refers to their obligation to maintain the light shields in a clean and un-obscured state.

These provisions are the least intrusive remedies first, to get the light shields cleaned up, and second, to keep them that way.

**Noise** (¶ 18 of the April 26 Order)

Paragraph 18 directs[30] defendants to certify that the diesel generators are being used for backup purposes only at RMSC and ARDC. Defendants have already provided this certification.

**Clinical & Medical Areas** (¶ 19 of the April 26 Order)

In both the environmental health opinions, the Court found that the sanitary conditions at the clinical and medical areas of GMDC, NIC and RMSC are constitutionally inadequate. *See* January 2001 opinion, 2001 WL 359488 *34–35; March 2001 opinion, 2001 WL 282705 *6.[31] In furtherance of that holding, the Court directed in ¶ 19 of the April 26 Order that defendants take certain narrowly drawn actions which are as unobtrusive as possible. Specifically, the Court directed that defendants:[32] (a) maintain the clinic and infirmary areas at NIC, GMDC and RMSC in a clean and sanitary condition and (b) assign cleaning crews to NIC, GMDC and RMSC for twice daily cleanings. *See* April 26 Order ¶ 19.

*(a) maintaining clean and sanitary conditions*

Defendants did not object substantively to any provisions of this requirement, but said that its subject matter is addressed in their internal directive, (Prop. Order at 41); however, Directive 3903, from which the requirements of this paragraph are taken has been in effect since 1995, and obviously did not cure the violation. *See* DX F–22 at 7–10. Therefore, the inclusion of the specific requirements enumerated as 1–10 in ¶ 19 of the April 26 Order are necessary to ensure that constitutional standards are achieved. Since defendants' regulations require compliance with the substance of the requirement, it is narrowly drawn and unobtrusive.

*(b) cleaning crews*

Defendants object only to the prohibition on using patients to clean the GMDC infirmary where the inmates are all ambulatory. *See* Prop. Order at 45. In fact, disabled inmates are housed there, and one detainee whose leg had been amputated testified that he was required to clean

---

**30.** The following merely summarizes the requirements of ¶ 18. For the precise directions of the Court see the April 26 Order.

**31.** *GMDC:* (January 2001 Opinion, 2001 WL 359488 *32.)

"Dr. Powitz's notes taken during an inspection tour of the GMDC Infirmary indicate that sanitation was 'poor.' (Pl.Ex. 106 at P00082.) In addition, storage containers were soiled and there was soil buildup in corners. (*Id.*) Dr. Powitz testified that expired medication was found in the medication room. (Tr. 626.)".

*NIC:* (March 2001 Opinion, 2001 WL 282705 *4.)

"Although much of the relevant portion of the January opinion reviews Dr. Powitz's testimony, Ms. Feeney's notes and testimony as well as other record evidence also clearly attest to the severe sanitation problems at NIC at the time of the two experts' visit to NIC in March, 2000. (*See* Pl. Exh. 366, at E06679–88; Tr. 959–968; Def. Exh. F–46 at E01758, 1813–4, 1822, 1853–54, 1906 (sanitarians' reports of NIC intake from August until November 1999))."

*RMSC:* (January 2001 Opinion, 2001 WL 359488 *34.)

"Director Feeney's notes taken during a tour of the RMSC clinic on March 21, 2000 can be summed up in the following notation: 'Clinics don't meet veternary [sic] standards.' (Pl.Ex. 366 at E06690.)"

**32.** The following merely summarizes the requirements of ¶ 19. For the precise directions of the Court see the April 26 Order.

the mold out of the bathtub himself before he could use it. *See* T108–09 (testimony of Fischetti). As a matter of common sense, sick people should not be relied upon to maintain sanitary conditions. The fact that they can walk does not mean that they are capable of working with mops and scrub brushes. Defendants do not propose a less intrusive alternative for ensuring sanitation in this area that can sensibly be relied upon to work.

Defendants object to the provision that "correctional and mental health staff" will identify persons whose living areas must be cleaned by cleaning crews, arguing that correctional staff lack authority to make determinations about the capabilities of inmates in mental health housing areas. *See* Prop. Order at 45. Their objection rests on a misunderstanding. The requirement does not contemplate altering the authority of correctional staff or mental health staff. Rather, correctional staff who supervise mental health living areas should report their observations about the cleanliness of those areas to mental health staff. This requirement is both unobtrusive and narrowly tailored since it merely directs the parties to follow a policy that the Department has represented is already in effect. *See* PX 9 at 2.

## III. PLAINTIFFS' MOTION TO AMEND THE APRIL 26 ORDER WITH RESPECT TO THE STATUS OF PRIOR ORDERS RELATING TO OCC

Plaintiffs moved to amend the April 26 Order to state that certain of the prior orders relating to OCC remain in effect until further order of this Court. Defendants oppose on the ground that all such orders have by their terms expired. The orders of February 24, 1995, December 9, 1999 and September 18, 2000 continue in

effect as modified by this and other orders of this Court.

## IV. PARTIES' MOTION TO AMEND ¶ 6 OF THE APRIL 26 ORDER

Paragraph 6 of the April 26 Order provides that the Department of Health "shall continue to thoroughly inspect each jail at least once every month and at more frequent intervals when required by the OCC Director." Plaintiffs argue, with uncharacteristic support from defendants, that conferring upon the OCC the power to "require" action by a City agency may be an unconstitutional delegation of judicial power. *See e.g. United States v. Doe*, 79 F.3d 1309, 1318–19 (2nd Cir.1996) (holding that the court could not delegate to the Probation Department the decision whether a convicted accountant must notify clients of a conviction). In an abundance of caution, the Court grants plaintiffs' request and strikes from ¶ 6 of the April 26 Order the words, "and at more frequent intervals when required by the OCC Director."

## V. PARTIES' MOTION TO CLARIFY ¶ 3 OF THE APRIL 26 ORDER

Paragraph 3 of the April 26 Order provides: "Under the direct supervision of the OCC Director, defendants shall continue to employ in each affected jail" environmental health officers, now to be known as "OCC–EHOs." The EHOs may be captains employed by the Department. Plaintiffs argue that placing the EHOs under the direct supervision of OCC would cause both legal and practical problems. Direct supervision has to do with the requisite reporting obligation of the OCC Director so that he may fulfill his obligations. The language in ¶ 3 of the April 26 Order, specifically the words, "Under the direct supervision of the OCC Director," are stricken. The April 26 Order in no way means or was meant to mean more than

that the Department will delegate to OCC the staff who will serve as OCC–EHOs, in continuation of existing practices.[33]

## VI. PLAINTIFFS' MOTION TO AMEND CERTAIN ERRORS IN THE APRIL 26 ORDER

### A. Training Of The Public Health Sanitarians And Dept. of Health Inspectors

Plaintiffs accurately point out that the April 26 Order does not require the pre-submission of the training curriculum for public health sanitarians and Department of Health inspectors. Since defendants have no objection to presenting such criteria to the Court, the April 26 Order is amended to provide that defendants do so by July 16, 2001.

### B. Access To The Institution By Plaintiffs' Counsel

Plaintiffs have not argued that the decision of the Court to limit the access of plaintiffs' counsel to the institutions was in any way legally wrong; thus the Court declines to make any changes to ¶ 7 of the April 26 Order. The fact that plaintiffs previously enjoyed such access under the consent decrees does not entitle them to such access now. It has been, and must remain, the objective of this Court to tailor the remedial order as narrowly as possible.

### C. Private Consultation With Members Of The Plaintiff Class

There being no objection by defendants, the Court hereby strikes the reference to defendants' counsel from the provisions of the April 26 Order that provide for confidential communications with members of the plaintiff class.

### D. Scope Of Relief Regarding Sanitation

Plaintiffs accurately point out that ¶ 11 of the April 26 Order incorrectly limited the scope of relief to 11 facilities, instead of 14. Paragraph 11 should read: AMKC (except for the medical areas), ARDC, GMDC, RMSC, JATC, GRVC, NIC, OBCC, MDC, BKHD, QHD, WEST, VCBC, and BXHD. In connection with this change, the last sentence of the third paragraph of the "INTRODUCTION" of the April 26 Order is amended to read:

> Specifically, this Court found violations at: the Adolescent Reception and Detention Center ("ARDC"); the Anna M. Kross Center ("AMKC"), the George Motchan Detention Center ("GMDC") and the Rose M. Singer Center ("RMSC"); the James A. Thomas Center ("JATC"); the George R. Vierno Center ("GRVC"); the North Infirmary Command ("NIC"); Otis Bantum Correctional Center ("OBCC"); the Manhattan Detention Center ("MDC"); the Brooklyn House of Detention ("BKHD"); the Queens Detention Center ("QHD"); West Facility ("West"); the Vernon C. Bain Center ("VCBC"); and Bronx Detention Center ("BXHD").

### E. Scope Of Relief Regarding Ventilation

Plaintiffs note that my March 2001 opinion extended the finding of unconstitutional ventilation to all areas of RMSC. Therefore, ¶ 15 of the April 26 Order is amended to read: "Defendants shall implement the following at ARDC, GMDC, GRVC, JATC, MDC, NIC, OBCC, the mental observations units at AMKC, RMSC, and the intake areas of QHD and BKHD."

### F. Ventilation Register Cleaning

There being no objection, the Court will amend ¶ 15(f) of the April 26 2001 Order to

---

**33.** Captain Boyd, for example, was delegated to OCC.

include the following sentence: "Defendants shall ensure that ventilation registers in all cells and pens in intake areas are cleaned weekly."

### G. Numbering Errors

Due to computer error, several ¶s are numbered incorrectly in the April 26 Order. Since these errors are cosmetic and create no confusion, the Court declines plaintiffs' request to make such a change in this Supplemental Order.

## VII. DEFENDANTS' MOTIONS FOR RECONSIDERATION

### A. Motion To Amend Deadlines Imposed By The April 26 Order

Defendants argue that the April 26 Order sets unreasonable deadlines that are unsupported by the record. For the reasons provided in Section "II" of this opinion, which provides findings relevant to the needs-narrowness-intrusiveness test, the Court finds that its deadlines are reasonable and fully supported in the record. However, as my concern is with the expeditious remediation of the jails, not punishing the Department of Corrections, this Supplemental Opinion & Order need not be the final word on plaintiffs' deadlines. Plaintiffs may make additional specific requests for extensions of time which the Court will decide in consultation with the Director of the OCC. Further, each deadline imposed by the April 26 Order that expires in either July 2001 or August 2001 is hereby extended by 60 days so as to provide the OCC Director with time to acquaint himself with the April 26 Order and the status of work being done in conformity with this Order.

### B. Motion To Amend The 6-Foot Bed Spacing Standard

For the reasons provided in Section "II" of this opinion the Court denies defendants' motion to amend the 6 foot spacing standard.

### C. Ventilation Balancing

For the reasons provided in Section "II" of this opinion, the Court denies defendants' motion to amend the obligation to balance the ventilation system or alter the deadlines for so doing. At the May 2000 hearings, witnesses for both sides testified that balancing ventilation systems is required. See T 1213 (Deputy Commissioner Tsu testifying that air handling units should be rebalanced annually); PX 366 at EO6656 (Patricia Feeney notes from MDC indicate the need to balance the HVAC system); T485 (Dr. Powitz testifies that the HVAC systems need to be cleaned and rebalanced as they are cleaned).

### D. Department of Health Inspection Of Medical Areas

The April 26 Order (¶ 6) directs the Department of Health ("DOH") to participate in inspections of the medical facilities. Defendants object, as they did prior to the issuance of the April 26 Order, contending that DOH inspectors are not trained to perform such inspections. Defendants' objection failed then, as it fails now. Defendants can train DOH inspectors to inspect the sanitation and infection control aspects of clinic sanitation or enter into an arrangement whereby the New York City Health and Hospitals Corporation ("HHC") performs the inspections, or for that matter amend the contract with its new provider for medical services.[34] If defendants require additional time to de-

---

34. HHC operates the City's municipal hospitals and many clinics.

**358**

vise a training curriculum for DOH inspections, they are free to raise that concern.

### E. Public Health Sanitarians

The Court grants defendants' unopposed motion to amend the description of public health sanitarians in the April 26 Order, and replaces the first sentence of footnote 1 with the following:

"Although the job description and qualification requirements vary to some degree among employers, a public health sanitarian for purposes of this Order is a college educated professional with 30 college credits in the biological and/or physical sciences who has undergone significant additional job-specific training."

### F. Use Of Correctional Staff To Identify Inmates Whose Cells Are To Be Cleaned By Others

Defendants reiterate an argument made before the issuance of the April 26 Order that correctional staff lack the expertise to identify inmates in mental health housing areas whose housing areas are to be cleaned by inmate cleaning crews. Let me clarify the requirements of ¶ 19b of the April 26 Order: correctional staff who supervise mental health living areas are to fulfill a reporting role only, reporting their observations about whether an inmate is not, or has stopped, cleaning his cell to mental health staff. Paragraph 19b does not confer on correctional staff the power to make determinations about such inmates.

### VIII. APPOINTMENT OF JOHN H. DOYLE III AS OCC DIRECTOR

The April 26 Order provided: "The Court must approve the selection of the new OCC Director, and will independently

select the OCC Director if the parties fail to promptly agree upon a mutually acceptable candidate." April 26 Order ¶ 2. Subsequently, the parties separately notified the Court of their proposed candidates, 8 in total.[35] On May 15, 2001, after interviewing the 8 candidates, the parties informed the Court that the list had been narrowed to 4 candidates, with each side supporting 2 different candidates. Because of the inability of the parties to reach consensus, I conducted interviews with candidates acceptable to one party or the other, and with additional candidates who I believed capable and appropriate. After a fairly searching inquiry, I have concluded to and hereby appoint John H. Doyle III as the Director of OCC.

Mr. Doyle is a graduate of Fordham College and The Harvard Law School. He served with the Lawyer's Committee for Civil Rights Under Law in Mississippi, as an Assistant United States Attorney in the Southern District of New York, and as Assistant Chief, and later Chief, of the Criminal Division in that office. He chairs the Committee on Drugs and the Law at the Association of the Bar of the City of New York, and served as co-chair of the Gender Subcommittee of the Second Circuit Task Force on Gender, Racial and Ethnic Fairness. He is a member of the firm in Anderson, Kill & Olick, P.C.

Mr. Doyle's appointment is effective immediately.

**SO ORDERED.**

---

35. Defendants proposed 5 candidates and plaintiffs proposed 3.