James **BENJAMIN**, et al., Plaintiffs–Appellees–Cross–Appellants,

v.

William J. **FRASER**, Commissioner of the Department of Correction of the City of New York, et al., Defendants–Appellants–Cross–Appellees.

Docket Nos. 01–7533(L), 01–7876(CON), 01–7934(XAP), 02–7115(CON).

United States Court of Appeals, Second Circuit.

Argued: March 26, 2003.

Decided: Sept. 2, 2003.

Elizabeth I. Freedman, Assistant Corporation Counsel of the City of New York (Leonard Koerner, Florence A. Hutner, June R. Buch, Assistant Corporation Counsels, on the brief), for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, NY, for Defendants–Appellants–Cross–Appellees.

Daniel L. Greenberg, The Legal Aid Society, Prisoners' Rights Project (John Boston, Dale A. Wilker, Madeline H. deLone, Lisa Freeman, on the brief), New York, NY, for Plaintiffs–Appellees–Cross–Appellants.

Before: McLAUGHLIN, B.D. PARKER, JR., and RAGGI, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

This appeal concerns the effect of the Prison Litigation Reform Act of 1995 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), on consent decrees settling seven class actions brought by pretrial detainees challenging the conditions of confinement at fourteen jails in New York City. At issue now are environmental and related health conditions at these institutions. When defendants-appellants, the City of New York, the Department of Correction ("DOC"), and various of its officials (collectively, "the City"), moved under the PLRA to terminate previously ordered prospective relief, the district court was required to consider whether the environmental health provisions of the decrees remained necessary to correct ongoing violations of federal law and whether the provisions were narrowly drawn and the least intrusive means for correcting the violations. *See* 18 U.S.C. § 3626(b)(3) (1993). The court also addressed whether the Office of Compliance Consultants ("OCC"), which had been appointed to monitor compliance with the consent decrees, was subject to the PLRA's provisions governing special masters. *See* 18 U.S.C. § 3626(f). In a series of orders, the court terminated some elements of

prospective relief and ordered the continuation, with modifications, of others. It also determined that since the OCC was not a special master, it was not subject to the PLRA's provisions governing special masters. The parties cross-appealed. We affirm in part and vacate and remand in part.

## BACKGROUND

### I. History of Litigation

In 1975, pretrial detainees in fourteen facilities in New York City[1] brought seven related class actions in the Southern and Eastern Districts of New York alleging that they were subject to unconstitutional conditions of confinement.[2] In 1978 and 1979, the parties entered into consent decrees purporting to resolve the detainees' complaints. Familiarity with the consent decrees and with the litigation concerning them during the ensuing twenty-five years is assumed. Enforcement of these decrees and related orders generated judicial involvement in "more than thirty discrete areas of prison administration." *Benjamin v. Jacobson,* 124 F.3d 162, 165 (2d Cir.1997) (*"Benjamin II"*). Among other things, the decrees sought to

> ensure that detainee mail and property are handled properly, and that procedures in concert with constitutional protections are followed during detainee cell and body searches. On an institutional

level, the Consent Decrees seek to maintain the physical plant of the jails in a condition safe for human habitation. They mandate that attention be given to vermin and insect control, sanitation, maintenance and refuse removal. Other provisions govern food services to the detainees and ensure that the detainees are adequately fed while in custody, with food that is prepared and served in a sanitary environment.

*Benjamin v. Jacobson,* 935 F.Supp. 332, 337 (S.D.N.Y.1996) (*"Benjamin I"*).

In 1982, the consent decrees were consolidated before Judge Morris E. Lasker of the Southern District of New York. After the agreement of the parties, Judge Lasker ordered the creation of the OCC, a neutral third party, to monitor and assist with compliance efforts. Between 1982 and 1987 the OCC was continued by agreement of the parties. Thereafter, pursuant to biannual orders of the district court, the OCC continued to operate with its responsibilities and activities periodically adjusted. *See Benjamin v. Fraser,* 156 F.Supp.2d 333, 336 (S.D.N.Y.2001) (*"Benjamin VIII"*).

Before enactment of the PLRA, the district court, because of changed conditions or changes in the law, was asked from time to time to modify or terminate various remedial provisions of the consent decrees.

---

1. These facilities are: the Anna M. Kross Center ("AMKC"), the Adolescent Reception and Detention Center ("ARDC"), the George Motchan Detention Center ("GMDC"), the James A. Thomas Center ("JATC"), the Rose M. Singer Center ("RMSC"), the George R. Vierno Center ("GRVC"), the North Infirmary Command ("NIC"), and the West Facility ("West") on Rikers Island; the Vernon C. Bain Center ("VCBC"), the Manhattan Detention Center ("MDC"), the Queens House of Detention ("QHD"), the Brooklyn House of Detention ("BKHD"), the Bronx House of Detention ("BXHD"), and the Correctional Insti-

tute for Men ("CIFM"), which is not involved in this proceeding.

2. *See Benjamin v. Malcolm,* 75 Civ. 3073 (S.D.N.Y.); *Forts v. Malcolm,* 76 Civ. 101 (S.D.N.Y.); *Ambrose v. Malcolm,* 76 Civ. 190 (S.D.N.Y.); *Maldonado v. Ciuros,* 76 Civ. 2854 (S.D.N.Y.); *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 79 Civ. 4913 (E.D.N.Y.); *Detainees of the Queens House of Detention for Men v. Malcolm,* 79 Civ. 4914 (E.D.N.Y.); *Rosenthal v. Malcolm,* 74 Civ. 4854 (S.D.N.Y.).

*See, e.g., Benjamin v. Koehler,* 710 F.Supp. 91 (S.D.N.Y.1989) (denying defendants' motion for temporary modification of decree concerning population limits in order to accommodate increase in jail population); *Benjamin v. Malcolm,* 156 F.R.D. 561 (S.D.N.Y.1994) (denying defendants' motion for modification of court order and decree provision concerning food preparation). When the PLRA came into effect in April 1996, however, and after the City swiftly moved for termination of the consent decrees, judicial scrutiny of the propriety of various categories of prospective relief in the decrees came to be required. The Act provides that any prospective relief (defined broadly by 18 U.S.C. § 3626(g)(7) as anything other than compensatory monetary damages) must be terminated if it was ordered in the absence of

> a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(b)(2).[3]

Responding to the City's motion, the detainees acknowledged that the relief in the consent decrees and related orders had been entered without the PLRA-mandated findings and that the record, as it stood, did not support such findings. They argued, however, that the PLRA was unconstitutional. *See Benjamin v. Jacobson,* 172 F.3d 144, 151–52 (2d Cir.1999) (en banc) (*"Benjamin III"*). In *Benjamin I,* the district court rejected their constitutional challenge, granted the City's motion for immediate termination, and vacated the consent decrees. On appeal, in *Benjamin II,* a panel of this court affirmed the district court's determination that the PLRA was constitutional, albeit under different reasoning, but reversed the vacatur of the consent decrees. The panel reasoned that the PLRA did not require the termination of consent decrees without the mandated need-narrowness-intrusiveness findings but merely prohibited their enforcement in federal court, with the parties free to enforce them in state court.

We then reconsidered these conclusions *en banc* and vacated the panel decision, concluding "that the Act provides for the termination, though not the annulment, of consent decrees that do not meet the need-narrowness-intrusiveness criteria established by the Act; that plaintiffs' constitutional challenges to the termination provision were properly rejected," but also "that plaintiffs were entitled to an opportunity to show, in accordance with the Act, that any or all of the prospective relief ordered by the Decrees should be continued." *Benjamin III,* 172 F.3d at 154.[4] We remanded so that they could have this opportunity.

## II. Environmental Health Rulings

In May 2000, the district court considered various environmental health and hygiene issues at the jails, taking testimony

---

**3.** We refer to these findings as "need-narrowness-intrusiveness" findings. The termination provision is limited by a provision directing courts *not* to terminate prospective relief if it finds that such relief "remains necessary to correct a current and ongoing violation of the Federal right" and otherwise meets the need-narrowness-intrusiveness test. 18 U.S.C. § 3626(b)(3).

**4.** On remand, the district court terminated various provisions of the consent decrees concerning such things as correspondence, law libraries, and contact visits. We affirmed the district court's decision not to terminate the consent decrees relating to attorney visitation and the use of restraints. *Benjamin v. Fraser,* 264 F.3d 175 (2d Cir.2001) (*"Benjamin V"*), affirming *Benjamin v. Kerik,* 102 F.Supp.2d 157 (S.D.N.Y.2000) (*"Benjamin IV"*).

from eighteen present and former detainees.[5] The detainees presented testimony from Robert W. Powitz, Ph.D., an expert in the field of environmental health. The DOC's Director of Environmental Health, Patricia Feeney, provided expert testimony for the City. *See Benjamin v. Fraser,* 161 F.Supp.2d 151, 154 (S.D.N.Y.2001) (*"Benjamin VI "*).

In its first order on environmental health conditions, the district court addressed eleven categories: (1) ventilation; (2) air temperature; (3) plumbing; (4) vermin; (5) food service; (6) personal hygiene and laundry services; (7) sanitation in non-medical areas; (8) lighting in non-medical areas; (9) noise; (10) medical areas; and (11) modular units. It found no ongoing violations of federal law with respect to plumbing, vermin control, food service, or personal hygiene and laundry services, but it found constitutional violations in certain facilities with respect to ventilation, air temperature, sanitation in non-medical areas and some medical areas, lighting, noise, and modular units. The court then directed the parties to submit recommendations for prospective relief. *See Benjamin VI,* 161 F.Supp.2d at 160–89.

Both parties moved for reconsideration. The detainees requested that the court reconsider its decisions concerning ventilation at two facilities and sanitation conditions at two other facilities. The City principally sought clarification of certain elements of the court's decision. The district court granted in part and denied in part both motions. *See Benjamin v. Fraser,* 2001 WL 282705, 2001 U.S. Dist LEX-IS 3173 (S.D.N.Y. Mar. 22, 2001) (*"Benjamin VII "*). It then solicited agreement on appropriate relief. On April 26, 2001, the court issued its "remedial order," directing the City to take various actions and, over its objections, ordering the OCC to continue to monitor certain aspects of compliance. The court ordered prospective relief in the areas of general sanitation, air temperature, ventilation, heating, lighting, noise, and sanitation in clinics and medical areas. The City appeals this order (01–7533).

The parties again cross-moved for reconsideration. Although these motions mostly raised narrow, technical issues, both parties also asked the court to determine whether the continued existence of the OCC complied with the "special master" provisions of the PLRA, 18 U.S.C. § 3626(f), and met the Act's need-narrowness-intrusiveness test. In still another decision, discussed in greater detail below, the court held that the OCC was not precluded by the PLRA. It also granted in part and denied in part other narrower requests for relief. *See Benjamin VIII,* 156 F.Supp.2d 333. Both parties appeal from this order (01–7876(L), 01–7934(XAP)).

In October 2001, the City moved for reconsideration or, alternatively, for a partial stay pending appeal. *See* Fed.R.Civ.P. 60(b) and 62(c). The district court denied this motion. *Benjamin v. Fraser,* 2002 WL 109610, 2002 U.S. Dist LEXIS 1228 (S.D.N.Y. Jan. 25, 2002) (*"Benjamin IX "*). The City appeals from this decision (02–7115).[6]

---

**5.** The district court had previously heard testimony from eleven prisoners concerning environmental health and hygiene in a February 2000 hearing, which it also considered in entering the orders on appeal. *See Benjamin v. Fraser,* 161 F.Supp.2d 151, 154 (S.D.N.Y. 2001) (*"Benjamin VI "*).

**6.** In March 2002, the City moved in this Court for a stay of limited aspects of the district court's orders. By order dated April 23, 2002, we granted a stay of three provisions of the district court's orders, mandating schedules for the completion of three projects: creating a six-foot separation between all inmate

## DISCUSSION

### I. Standard of Review

Generally, we review "questions of law *de novo*, [] questions of fact for clear error, and [] matters of discretion for abuse of discretion." *Benjamin V*, 264 F.3d at 184. Accordingly, the district court's factual findings regarding the conditions at the facilities are reviewed for clear error, but its conclusions about their constitutionality are reviewed *de novo*. *See Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.2002); *see also United States v. Millan*, 4 F.3d 1038, 1043 (2d Cir.1993) ("[W]e review the district court's findings of historical fact in this case for clear error, but we review its ultimate resolution of the constitutional due process issue *de novo*.").

Yet, as the First Circuit has recognized, *see Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649, 661 (1st Cir.1997), this fact/law dichotomy may be somewhat too blunt a tool for the delicate task of reviewing the constitutional issues at hand, since some of the conclusions we must review do not involve questions exclusively of law or fact. Many rest squarely within the district court's duty as fact finder; yet some ostensibly factual findings implicate constitutional conclusions. An example is whether food-service sanitation implicates the safety of the detainees to a constitutional extent. In evaluating the district court's resolution of such an issue, the appropriate standard of review turns on the nature of the finding or conclusion being challenged, that is, whether the challenge concerns the conditions the court found to exist or the court's conclusion about whether those conditions implicated the Constitution. *See id.*

### II. OCC and PLRA Special Master Provisions

We first consider whether the OCC's continued participation in this litigation on the terms ordered by the district court comports with the PLRA.

### A. OCC's creation and continuation

As we have seen, the district court has long used the services of the OCC as a neutral third party to assist the litigants in the implementation of the consent decrees and in dispute resolution and to assist the court in monitoring the City's compliance with its obligations.[7] The OCC was created in 1982, when the parties agreed by stipulation to hold in abeyance a contempt motion filed by the detainees, whose agreement to postpone consideration of the motion was predicated on the OCC's creation. Between 1982 and 1987, the parties consented to renewals of its mandate. In 1987, however, when the parties were unable to agree on the terms of renewal, the district court renewed the OCC's mandate after finding that the OCC's existence was necessary to ensure compliance with the consent decrees. (*See* Jan. 6, 1997 Mem. and Order, 75–Civ–3073, at 2).[8]

---

beds, completing the remaining shower renovations, and replacing lighting fixtures.

7. The court's 1995 OCC order, which contains its fullest description of the OCC's responsibilities, is illustrative of the OCC's general mandate. This order describes the OCC as a "neutral third party [serving] to advise and assist the defendants in achieving compliance with the Consent Judgments and informally to assist the parties in resolving disputes as to compliance with the Consent

Judgments." (1995 OCC Order, 95–Civ–3073, at 2). The order also gives its director a variety of information-gathering powers, directs him to make reports to the court concerning compliance status, problems and recommendations, and sets the OCC's staff and compensation. (*Id.*).

8. Also in 1987, the parties and the OCC agreed on a plan contemplating disengagement from the consent decrees pursuant to a two-step procedure. First, for each individu-

Following enactment of the PLRA, the City objected to the continued participation of the OCC, asserting that the terms of its continuation would now have to comply with the special master provisions of the Act, which would require, among other things, that the OCC be compensated by funds appropriated to the judiciary instead of by the City.[9] Tying the OCC to these provisions would likely render its continued involvement impracticable. The district court ordered the continuation of the OCC, based on its determination that it continued to play a necessary and beneficial role in monitoring and assisting the City's compliance efforts and the court's desire to maintain the status quo in light of our stay pending appeal of its order holding the PLRA to be constitutional. (*See* Jan. 6, 1997 Mem. and Order, aff'd, *Benjamin v. Jacobson*, 122 F.3d 1055, 1997 WL 560944 (2d Cir. Sept.10, 1997) (unpublished table decision)).

In its remedial order, the district court renewed and adjusted the OCC's mandate, giving it substantial responsibilities for monitoring environmental conditions in the various facilities. (*See* Apr. 26, 2001 Order at 3–7). In a separate order, the court considered whether the existence of the OCC was consistent with the special master provisions of the PLRA, 18 U.S.C. § 3626(f). Although noting that the OCC was not, in its view, a special master as defined by the Act, the district court concluded that the OCC was, in any event, not subject to § 3626(f) because that section

expressly "does not apply to pre-enactment court authorizations." *Benjamin VIII*, 156 F.Supp.2d at 338. Moreover, the court found that even if the temporal reach of the Act were not clear, "applying the special master provision to extant institutions like OCC would have an impermissible retroactive effect." *Id.* at 339.

The City argues that (1) the OCC is a "special master" under § 3626(f); (2) its monitoring activities exceed the PLRA's limitations on the powers of special masters; (3) after enactment, the OCC is subject on an ongoing basis to the PLRA's limitations on the appointment, compensation, and powers of special masters; and (4) even if it is not a special master, the OCC is still prospective relief, subject to the Act's need-narrowness-intrusiveness test.

### B. OCC is not a special master

 Although concluding that the "OCC is not now, and never has been, a special master as defined by the PLRA," the district court did not rest on that ground, apparently because it viewed that conclusion as leaving open the question whether "the PLRA's special master provisions leave intact the power of courts to appoint entities of a different stripe, like OCC." *Benjamin VIII*, 156 F.Supp.2d at 335. We see the matter somewhat differently. If the OCC is not a special master, then the provisions in the Act applicable to special masters do not apply to the OCC

---

al issue addressed by the decrees, the City would be entitled to certification of compliance by the OCC by meeting certain conditions. Then, after certification of compliance on an issue, that issue would undergo a "compliance verification process," subject to OCC monitoring for a pre-set period. Once a verification period was completed successfully, that issue would be withdrawn from active monitoring. (May 21, 1987 Disengagement

Plan). Notwithstanding the parties' agreement to the disengagement plan, since 1987 the OCC has owed its continued existence, at least in part, to approximately biannual court orders. *Benjamin VIII*, 156 F.Supp.2d at 336.

9. The City has funded the OCC since its inception.

and would not bar its participation.[10] Because we agree with the district court that the OCC is not a special master under the PLRA, we also agree that continuing to use it does not violate the Act.

The term "special master" is defined by the PLRA as "any person appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court." 18 U.S.C. § 3626(g)(8). But this circular definition provides little assistance in determining whether an entity created to engage in informal advisory and monitoring functions is exercising the powers of a master. Consequently, we must look beyond the text of the Act for guidance.

The powers of special masters, who are quasi-judicial officers, are set forth generally in Federal Rule of Civil Procedure 53. *See generally Collins v. Foreman*, 729 F.2d 108, 118 (2d Cir.1984) (analogizing masters to magistrates); *Reed v. Rhodes*, 691 F.2d 266, 269 (6th Cir.1982) (noting that special master acts "in a quasi-judicial capacity"). They include the ability to convene and to regulate hearings, to rule on the admissibility of evidence, to subpoena and swear witnesses, and to hold non-cooperating witnesses in contempt. Fed. R.Civ.P. 53(c)-(d). *See Texas v. New Mexico*, 423 U.S. 942, 942–43, 96 S.Ct. 351, 46 L.Ed.2d 274 (1975) (mem.) (appointing special master "with authority to fix the time and conditions for the filing of additional pleadings and to direct subsequent proceedings, and with authority to summon witnesses, issue subpoenas, and take such evidence as may be introduced and such as he may deem it necessary to call for," and directing him to submit appropriate reports). The master's responsibilities typically culminate in a report. If the report includes findings of fact, they are binding in non-jury actions unless clearly erroneous. Fed.R.Civ.P. 53(e)(2).

The OCC's functions are quite different from those of a Rule 53 special master. The OCC was not appointed to hold hearings, subpoena witnesses, take testimony, or rule upon evidence. It does not prepare reports to assist in the court's determination of discrete issues of law or fact, and its factual findings are not legally entitled to deference. The OCC's reports, which are neither formally filed in the court's docket nor adopted, modified, or rejected by the court, serve a different function from the typical report of a special master. Besides informing the court of ongoing compliance efforts, these reports facilitate the City's awareness of its compliance with remedial directives. In other words, the OCC serves a monitoring function; it does not exercise quasi-judicial power.[11]

Nothing in the text of § 3626(f) expressly reveals Congress's intent either to treat all court-appointed agents as special masters or to prohibit a court from appointing agents to perform functions that differ from the quasi-judicial activities of special

---

**10.** The City has not argued that anything other than the PLRA bars the district court's use of the OCC.

**11.** That the powers of a monitor may sharply diverge from those of a master was observed by the authors of Special Project: The Remedial Process in Institutional Reform Litigation, 78 Colum. L.Rev. 784, 829 (1978) (footnotes omitted) (emphasis added):

If the monitor is a court officer designated a "master," the court may treat its reports with the deference due master's reports, accepting the findings of fact "unless clearly erroneous." *But a monitor's activities are so unlike those of a rule 53 master that the court should not do so.* Monitoring rarely, if ever, proceeds by the quasi-judicial hearings envisaged by rule 53.

masters. Indeed, to the extent the PLRA's definition of "special master" is not entirely circular, by limiting its reference to court-appointed agents to those performing the duties of a master, the Act, we believe, implicitly incorporates the long-recognized principle that Article III courts may appoint agents to engage in a variety of activities essential to the performance of judicial responsibilities. *See Ex Parte Peterson,* 253 U.S. 300, 312–13, 40 S.Ct. 543, 64 L.Ed. 919 (1920) ("Courts have ... inherent power ... to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties," including "special masters, auditors, examiners, and commissioners."); *Newman v. Alabama,* 559 F.2d 283, 290 (5th Cir.1977) (recognizing distinction between monitor and master in context of prison litigation).[12]

The conclusion that Congress did not intend "special master" to refer to all court agents draws some support from the legislative history of the PLRA. This history is somewhat scant, in part because the PLRA was enacted as part of an omnibus appropriations bill. *See* 142 Cong. Rec. S 2292, 2296 (1996) (Sen.Kennedy) (lamenting fact that PLRA was subject to a single Judiciary Committee hearing, not resulting in a report). Congress's contemplation of a predecessor bill to the PLRA, introduced but not passed in the House of Representatives, is instructive. This bill, entitled Stop Turning Out Prisoners ("STOP"), expressly provided that in prison conditions litigation, "any special master *or monitor* shall be a United States magistrate and

shall make proposed findings on the record on complicated factual issues submitted to that special master *or monitor* by the court, but shall have no other function." H.R. 667 § 301, proposed new section 18 U.S.C. § 3626(e) (quoted in H.R.Rep. No. 104–21 at 6 (1995)) (emphasis added). The committee report on STOP noted that this provision would apply "to anyone relied on by the court to make factual findings *or to monitor or review compliance* with, enforcement of, or implementation of a consent decree or of court-ordered relief in a prisons conditions suit." H.R.Rep. No. 104–21 at 28 (emphasis added).

▮ If enacted, STOP would have done precisely what the City argues the PLRA does: bar the use of monitors in prison conditions litigation. But, in light of STOP's express prohibition of the use of monitors, to draw the conclusion that the PLRA meant silently to prohibit their use would show infidelity to what we know of Congress's intentions. Well-settled principles of statutory construction dictate that "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russelloo v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (citing *Arizona v. California,* 373 U.S. 546, 580–81, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963)). The Supreme Court has instructed that "[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend

---

**12.** Courts have used their inherent power and their express authority under the federal rules to appoint agents to perform a variety of functions. Particularly in cases raising significant technical or scientific issues, for example, courts have employed court-appointed experts and specially trained law clerks. *See generally, Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 149, 118 S.Ct. 512, 139 L.Ed.2d 508

(1997) (Breyer, *J.,* concurring) (citing J. Cecil & T. Willging, Court–Appointed Experts: Defining the Role of Experts Appointed Under Federal Rule of Evidence 706, pp. 83–88 (1993); J. Weinstein, Individual Justice in Mass Tort Litigation 107–110 (1995); Kaysen, In Memoriam: Charles E. Wyzanski, Jr., 100 Harv. L.Rev. 713, 713–15 (1987) (discussing a judge's use of an economist as a law clerk)).

*sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 442–43, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (citations and internal quotation omitted). Congress's contemplation of STOP indicates its awareness of the distinction between quasi-judicial court agents appointed to undertake the activities of a master, as generally outlined in Rule 53, and monitors employed by courts to assist in compliance with remedial orders.

The City observes that on occasion courts have referred to monitors as "special masters," *see, e.g., United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir.1994) (per curiam) ("The power of the federal courts to appoint special masters to monitor compliance with their remedial orders is well established."); *Juan F. v. Weicker*, 37 F.3d 874, 880 (2d Cir.1994), and have on other occasions cited Rule 53 as authority for a court's appointment of an agent to monitor compliance with remedial orders, *see, e.g., Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 482, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). But in most cases the City cites, the distinction between a master and a monitor was irrelevant to the dispute at hand. And the one case in which the distinction was salient is not helpful to the City. In *Juan F.*, a case involving a challenge to Connecticut's child-welfare system, we were asked to determine whether the district court had properly adopted the findings of fact and legal recommendations of a "monitor" created by a consent decree. Determining that the findings and recommendations were adopted at the conclusion of a three-day hearing, involving opening statements, the placing of documents into evidence, formal stipulations of fact, a court reporter, the swearing in of witnesses-in short, effectively a trial-we concluded that the monitor's findings were

entitled to deference because it was evident that the monitor was actually "a special master, albeit by another name." *Juan F.*, 37 F.3d at 880. *Juan F.* stands for the sound proposition that, in evaluating the legal status of court-appointed agents, we are guided more by their function than by their title. Applying this functional test, we conclude that the OCC does not perform the duties of a special master and, accordingly, is not subject to the requirements of § 3626(f).

To be sure, one gathers from certain statements of the PLRA's sponsors that they were motivated in part by a perceived over-involvement of federal courts in the remedial aspects of prison conditions litigation. *See, e.g.,* 146 Cong. Rec. S 14611, 14626 (1995) (Sen.Dole) (bemoaning the activities of "liberal Federal judges who see violations of constitutional rights in every prison complaint and who have used these complaints to micromanage State and local prison systems"). One could extrapolate from this concern a desire to limit, perhaps entirely to prohibit, the use of court-appointed monitors. But we must ultimately look to Congress's text, not to concerns it did not address in the relevant statutory language. This task leads us to conclude that § 3626(f) does not bar courts from using monitors to assist compliance efforts with remedial orders.

### C. Temporal reach

■ We also agree with the district court that, even if the OCC were a special master under the PLRA, it still would not be subject to § 3626(f), because that section applies only to court agents appointed post-enactment. By its terms, § 3626(f) is entirely prospective; it provides that a court "may appoint" or "shall appoint" a special master, § 3626(f)(1)(A) and (B), and otherwise consistently refers to appointments "under" the Act. *See, e.g.,* 18 U.S.C. § 3626(f)(3), (4), (5), (6). Assuming,

as seems appropriate, that an appointment "under" the Act can only take place "after" the law's enactment, we conclude that the OCC was plainly not appointed "under" § 3626(f), as it was appointed well before that section existed. Nor do we read this section to govern the renewal of the OCC's mandate post-enactment. There is a difference between a renewal, modification, or continuation of a pre-existing appointment and an appointment. The appointment provisions of the section clearly concern post-enactment appointments. *See* 18 U.S.C. § 3626(f)(2). The continued existence of the OCC has been authorized after the PLRA's enactment; its appointment occurred well before.[13]

To the extent the text of the Act is ambiguous about its temporal reach, that ambiguity is resolved by comparing its treatment of pre-existing prospective relief with its treatment of pre-existing court agents. *See Lindh v. Murphy*, 521 U.S. 320, 330–336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (drawing the negative implication that chapter 153 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") did not apply to pending cases from the fact that chapter 154, addressing a similar issue, expressly provided its ap-

plicability to pending cases). Although the PLRA expressly requires courts to reevaluate past awards of prospective relief, *see* 18 U.S.C. § 3626(b), it does not expressly require the reevaluation of past appointments of special masters.[14]

█ Finally, even if the temporal reach of § 3626(f) were unclear, we agree with the district court that applying this section to the OCC would have an impermissible retroactive effect, as it would attach "new legal consequences to events completed before its enactment." *INS v. St. Cyr*, 533 U.S. 289, 321, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (internal quotation and citation omitted). In particular, applying § 3626(f) to the OCC, which would effectively bar its use, would disrupt the detainees' settled expectations in deciding to forego enforcement litigation for the City's purportedly extensive violations of the consent decree in favor of the informal processes, including the disengagement plan, supervised by the OCC.[15] *See id.*

For these reasons, we conclude that the OCC is not subject to § 3626(f).

## D. Is OCC "prospective relief"?

█ A final question concerning the OCC remains: whether it is "prospective

---

**13.** We are concerned, of course, only with the situation before us. There may be situations in which court agents created pre-enactment have passed out of existence in a manner making a post-enactment authorization an appointment, governed by § 3626(f). But as the district court observed, this is not such a case. The OCC has been a "continuous entity." *Benjamin VIII*, 156 F.Supp.2d at 336. To term any of the court's post-enactment authorizations an "appointment" would not comport with the plain meaning of that term.

**14.** Citing a colloquy between Senators Abraham and Gregg occurring several weeks *after* the measure was passed, the City argues that the legislative history demonstrates Congress's intent to apply the special master provisions to pre-enactment appointments. *See* 142 Cong. Rec. S. 12463 (1996). But state-

ments not made during the legislative process, but after the statute becomes law, are unreliable aids to statutory construction. *See Heintz v. Jenkins*, 514 U.S. 291, 297–98, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 132, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) ("[P]ost-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage.").

**15.** The City relies on *Martin v. Hadix*, 527 U.S. 343, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999), which held that provisions of the PLRA governing attorney's fees applied to work done post-enactment. But here, unlike in *Martin*, application of the provisions at issue would disrupt settled expectations.

relief" subject to the need-narrowness-intrusiveness test of § 3626(b). The district court found that it was not because the "OCC is exclusively a monitoring body, and monitoring itself, independent of the conditions to be monitored, cannot be relief." *Benjamin VIII*, 156 F.Supp.2d at 342. We find this conclusion somewhat problematic. First, by finding both that the OCC was neither a special master nor an element of prospective relief, the district court placed it entirely beyond the reach of the PLRA, frustrating one of the Act's broad goals of limiting the "micromanag[ing] [of] State and local prison systems." 141 Cong. Rec. S 14611, 14626 (Sen.Dole) (1995). Second, although functioning generally as a monitoring body, the OCC's substantial responsibilities permit no easy distinction between relief itself and the monitoring of relief.

Fortunately, we need not resolve this question because the district court made the appropriate need-narrowness-intrusiveness findings. It found that

> the nearly twenty year history of incomplete compliance with the consent decrees amply attests to the need for external monitoring, and that the April 26 Order (1) directs OCC to monitor only those conditions which this Court found to constitute "current and ongoing" violations in the environmental conditions opinions, (2) reduces the scope of OCC's monitoring from previous orders in recognition of the remedial work defendants have completed, and (3) provides OCC with limited resources that are sufficient only to carry out its narrow range of activities.

*Benjamin VIII*, 156 F.Supp.2d at 343.

The court also expressed its "view [ ] that a more robust OCC would substantially compress the time it takes to correct the constitutional violations, release this Court from its role and provide minimal standards for thousands of detainees," but "with an eye to the PLRA and in the interest of minimizing the burden on defendants," the court preserved the OCC's limited role. *Id.*

To the extent they are required, the district court's findings are sufficient. In attempting to demonstrate that they are erroneous, the City argues that it could handle the OCC's responsibilities itself. (*See* Def. Br. at 13). But, particularly in light of the district court's finding that the City's compliance with its remedial responsibilities has been consistently incomplete and inadequate, we do not disturb the district court's findings.

## III. Continuing Prospective Relief

The district court found constitutional violations in the areas of ventilation, sanitation, lighting, and heating. It ordered a variety of relief, which, in accordance with the PLRA's requirements, it found necessary, narrowly drawn, and the least intrusive means of correcting the violations. In this section, we consider the City's challenges to these findings and to the corresponding relief. In certain instances, findings and relief sought by the detainees in other areas were denied. In the following section, we consider their challenges to those findings.

### A. Legal standard

██ As the district court correctly concluded, the detainees' challenges to the environmental conditions of their confinement are properly reviewed under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth. *See Benjamin VI*, 161 F.Supp.2d at 156 (citing *Bell v. Wolfish*, 441 U.S. 520, 53[5] n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). This is because "[a] person lawfully com-

mitted to pretrial detention has not been adjudged guilty of any crime," *Bell*, 441 U.S. at 536, 99 S.Ct. 1861, and thus, under the Due Process Clause, may not be punished in any manner-neither cruelly and unusually nor otherwise. *See id.* at 535, 99 S.Ct. 1861. Accordingly, courts considering challenges by pretrial detainees must initially consider whether the challenged conditions are punitive. *Id.* Because restraint is always necessary in effectuating confinement, not every uncomfortable or disabling condition and restriction can be considered punitive. *See id.* at 537, 99 S.Ct. 1861.[16]

■ But because this punitiveness inquiry focuses principally on the *purpose* of an imposed disability, it is of limited utility when evaluating the environmental challenges to prison conditions at issue in this case, which, for the most part, were not affirmatively imposed. Consequently:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, cloth-

ing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the ... Due Process Clause.

*DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (citation omitted). *See also County of Sacramento v. Lewis*, 523 U.S. 833, 851–852, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Youngberg v. Romeo*, 457 U.S. 307, 319–325, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

■ The Due Process Clause obliges states to consider the welfare of pretrial inmates since, "in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory." *County of Sacramento*, 523 U.S. at 851, 118 S.Ct. 1708. For this reason, although a pretrial inmate mounting a constitutional challenge to environmental conditions must show deliberate indifference, it may generally be presumed from an absence of reasonable care.

> [L]iability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.

---

**16.** In *Bell*, the Court identified the following factors, from *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), as useful guideposts in determining whether a challenged condition or restriction is punitive in nature:

"Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment-

retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions."

*Bell*, 441 U.S. at 537–38, 99 S.Ct. 1861 (quoting *Mendoza–Martinez*, 372 U.S. at 168–69, 83 S.Ct. 554).

*Id.* at 853, 118 S.Ct. 1708.[17]

### B. The City's claims of error

### 1. Deliberate indifference

██ The City asserts that, assuming *arguendo* that the detainees have been deprived of constitutional rights, the district court erred in finding deliberate indifference. This finding was primarily based on the City's failure to remedy serious violations to which it had long been alerted:

> [T]he Consent Decrees have been in place for more than a generation, and accordingly, the *Department, qua* Department cannot demonstrate that it did not have actual knowledge of any conditions which are unconstitutional from an objective standpoint. The deficiencies shown at trial are largely the continuations of deficiencies that have been known, obvious, and commented upon by the [OCC] and plaintiffs' counsel for years, ... and that have been the subject of further court orders between the entry of the Consent decrees and the present proceedings.

*Benjamin VI,* 161 F.Supp.2d at 159.

██ The City, citing its good-faith compliance efforts, asserts that the detainees failed to demonstrate a "wanton disregard of their rights." (Def. Br. at 26). By this argument, the City attempts to impose upon the detainees the burden of making a showing of deliberate indifference under the Eighth Amendment, a showing that does require demonstrating wantonness or, more specifically, that officials knew of and disregarded an excessive risk to inmate health or safety. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). But this requirement is unique to Eighth Amendment claims, stemming from that amendment's prohibition of cruel and unusual *punishments*-as opposed to cruel and unusual *conditions. See id.* at 837–38, 114 S.Ct. 1970. The analysis of a claim brought by an individual who may not be punished at all is different, beginning instead from the premise of a state's obligation to take some responsibility for the safety of those involuntarily committed to its custody. As discussed above, in a challenge by pretrial detainees asserting a *protracted* failure to provide safe prison conditions, the deliberate indifference standard does not require the detainees to show anything more than actual or imminent substantial harm.[18]

Nor do the City's compliance efforts, some more effective than others, prevent its liability. The district court found that the ongoing constitutional violations were, for the most part, "continuations of deficiencies that have been known, obvious, and commented upon ... for years" and that the City's remedial efforts were large-

---

**17.** To establish the deprivation of a basic human need such as reasonable safety, an inmate must show "actual or imminent harm." *Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The identification of a purely theoretical deficiency in an institution will not suffice; a healthy inmate cannot sustain a claim of "constitutional violation because of the inadequacy of the prison infirmary." *Id.* at 351, 116 S.Ct. 2174. *See also Rhodes v. Chapman,* 452 U.S. 337, 367, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (Brennan, J., *concurring* ) ("A court is under the obligation to examine the *actual effect* of challenged conditions upon the well-being of the prisoners.").

**18.** In other types of challenges-for example, when pretrial detainees challenge discrete judgments of state officials-meeting the deliberate indifference standard may require a further showing. *See, e.g., Liscio v. Warren,* 901 F.2d 274 (2d Cir.1990) (challenge to medical care of pretrial detainee); *Bass v. Jackson,* 790 F.2d 260, 262–63 (2d Cir.1986) (allegation of failure to protect from inmate-inmate assault).

ly ineffective. *Benjamin VI*, 161 F.Supp.2d at 159. Giving appropriate deference to the district court, which has overseen these efforts for over twenty years, we see no reason to disturb either conclusion.

### 2. Unconstitutionality findings

■ Under the PLRA, prospective relief must be terminated unless there are current and ongoing violations of federal rights. *See* 18 U.S.C. § 3626(b)(3). The City contends that "the violations that the District Court found with respect to the areas of ventilation, lighting, and air temperature, simply do not rise to the level of unconstitutionality." (Def. Br. at 31). In support, the City looks to largely inapposite Eighth Amendment authority, *e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and fails to address, except in a conclusory fashion, the district court's detailed findings of unconstitutionality with respect to these conditions.

In finding constitutionally inadequate ventilation at eleven facilities,[19] the district court noted, among other things, the presence of large numbers of inoperable windows, clogged or dirty ventilation registers and exhaust vents in showers and cells, and poor air quality. It then made specific findings concerning the threatened and actual health hazards resulting from these conditions. *Benjamin VI*, 161 F.Supp.2d at 162–65. In finding constitutionally inade-

quate lighting at nine facilities,[20] the district court found, among other things, that inmates on occasion were left with inoperable lights in their cells for days on end, *see id.* at 183, and that in some cells where the lighting fixtures did work, the light emitted was barely discernible, *see id.* at 184.[21] In finding inadequate heat and extreme temperatures at ten facilities,[22] the court noted that the evidence of extreme temperatures, including no heat at all at times during the winter, was essentially uncontroverted. *Id.* at 170. In view of these factual findings, we affirm the district court's legal conclusion that inadequate ventilation, lighting, and exposure to extremes of temperature violated the detainees' constitutional rights.

### 3. Remedies

The City more strenuously, and somewhat more persuasively, contests several elements of the prospective relief ordered by the court. As discussed, under the PLRA prospective relief may continue only if the court makes need-narrowness-intrusiveness findings. *See* 18 U.S.C. § 3626(b)(3). After finding current and ongoing violations, the district court prudently solicited agreement from the parties on appropriate remedies and deadlines for compliance. Although the deference due prison administrators by courts is implicated primarily by questions relating to institutional security of a type not raised on this appeal, the court recognized that,

---

**19.** Specifically, the court found inadequate ventilation at ARDC, GMDC, GRVC, JATC, MDC, NIC, OBCC, the mental observation units at AMKC, and the intake areas at RMSC, QHD, and BKHD. (Apr. 26, 2001 Order at 11).

**20.** The court found inadequate lighting at GMDC, RMSC, JATC, GRVC, NIC, OBCC, MDC, BKHD, and QHD. (Apr. 26, 2001 Order at 14).

**21.** Although we affirm the district court's finding of unconstitutional lighting conditions, in our discussion of the remedy it imposed, we address a troubling ambiguity in its discussion. *See infra* § III.B.3.d.

**22.** The court found violations at AMKC, ARDC, BKHD, GMDC, GRVC, JATC, NIC, OBCC, QHD, and RMSC. (Apr. 26, 2001 Order at 9, 13).

due to its superior institutional knowledge, the City's participation in the development of all aspects of the remedial orders was invaluable. *Compare Bell,* 441 U.S. at 547–548, 99 S.Ct. 1861.

### a. Bed-spacing requirement

■ Of the numerous remedies ordered by the court to correct inadequate ventilation, the City primarily challenges the requirement that all inmate beds be spaced so that heads are at least six feet apart while the inmates are sleeping. (*See* Apr. 26, 2001 Order at 12). It contends that this requirement "is not supported by law or fact, nor justified by any empirical scientific data," and that, moreover, implementing it "will entail a significant loss of bed capacity," which could threaten inmate safety. (Def. Rep. Br. at 36–37). Because most of the beds in the facilities are placed less than three feet apart and are bolted to the floor, complying with the order would, the City asserts, require significant and costly changes in the facilities' dormitory housing that are neither warranted nor practical. (*See id.* at 37–39).

In imposing this remedy, the district court relied exclusively on brief testimony by Dr. Robert W. Powitz, the detainees' expert, who stated, in the court's words, "that beds should be placed such that prisoners' heads are 6 feet apart because droplets emanating from one person's mouth remain airborne for at least three feet but generally not as far as 6 feet." *Benjamin VIII,* 156 F.Supp.2d at 349. The court reasoned that the City's failure to space beds sufficiently far apart was necessarily a violation of a constitutional right and the six-foot requirement was thus, "by definition[,] necessary to correct the violation." *Id.*

We agree with the City that this remedy fails the PLRA's need-narrowness-intrusiveness test. There is no constitutional requirement that pretrial detainees have six feet of breathing room. Assuming it could be demonstrated that forcing a detainee to sleep too close to another violated due process, this demonstration would require a showing of actual or imminent substantial harm. *See Lewis,* 518 U.S. at 350, 116 S.Ct. 2174. Since our review of the record generates no evidence of actual harm and insufficient evidence on which to conclude that harm, of some substantial extent, was imminent, we vacate this aspect of the district court's order of prospective relief.

### b. Operational windows

■ The City also contests as overly broad and burdensome the court's requirement that all windows designed to be opened must be operational. Contending that under the PLRA the district court was obliged to consider the utility of each window individually, the City observes:

> The effect of a window defect depends upon the nature and degree of the defect, and the nature of the housing area, as well as the outside temperature. For example, a single window in a dayroom or modular unit that is stuck open a crack in mild weather, or one window that will not open among many windows that are operational in a particular area, will not cause unconstitutional conditions in that area. (Def. Br. at 48).

■ But it is ironic that the City, which strenuously opposes the OCC's continued participation, invokes the PLRA, which was intended in part to prevent judicial micro-management, in support of the proposition that the district court was required to examine every window. We agree with the district court that a comprehensive repair program would be more effective and less intrusive than an individual review of each window at the various facilities. *See Benjamin VIII,* 156

F.Supp.2d at 350. Although the PLRA's requirement that relief be "narrowly drawn" and "necessary" to correct the violation might at first glance seem to equate permissible remedies with constitutional minimums, a remedy may require more than the bare minimum the Constitution would permit and yet still be necessary and narrowly drawn to correct the violation. Given the impracticability of the court examining each window, ordering comprehensive repairs was a necessary and narrowly drawn means of effectuating relief-even though the Constitution would certainly permit a broken window or two.[23]

### c. Heating-system certification

■ Of the remedies imposed dealing directly with air temperature, the City challenges only the requirement that it certify by October 15 of each year that heating systems have been inspected, tested, and repaired to working order or replaced. (*See* Apr. 26, 2001 Order at 13). It repeats the argument, rejected twice below, that, although it will be able to complete any necessary repairs before the onset of cold weather, the October 15 date is too inflexible. The district court seems to have borrowed this date from the DOC's own policy directive, which provides that "[e]very effort will be made to repair any inoperable heating equipment by October 15th of each year." As the court explained, October 15 is a sensible cut-off date because it generally marks the start of the cold-weather season. Since the City has offered no cogent explanation why this date is unreasonable, we see no reason to

disturb the district court's determination that it is appropriate. We are confident that if compelling circumstances do arise preventing compliance by this deadline, the district court will consider any appropriate application for relief.

### d. Lighting requirement

■ To remedy unconstitutional lighting conditions, the court ordered, among other things, that at least twenty foot-candles of light be provided in all cells and dormitory housing areas. (*See* Apr. 26, 2001 Order at 14). The City objects that this remedy is (1) overbroad, because ten foot-candles of light is sufficient; (2) unnecessary, because some inmates prefer dimmer lights; and (3) overly intrusive, because the deadline for compliance is unreasonable.

There is a troubling ambiguity in the district court's award of this remedy. Although noting that it considered the DOC's ten foot-candle standard "inadequa[te]," the court's ultimate finding of unconstitutionality seems to have rested not simply on this standard, but on the inadequacy of the lighting actually provided. *Benjamin VI*, 161 F.Supp.2d at 182. The district court found this inadequacy, and we affirm, based on its findings of: (1) non-working light fixtures; (2) inadequate light-bulb wattage; and (3) obstructed luminary covers. *See id.* In a subsequent order, however, the court again stated that it had found the ten foot-candle lighting standard itself "constitutionally inadequate." *Benjamin VIII*, 156 F.Supp.2d at 352. The parties focus on this finding on

---

23. With respect to the court's ventilation remedies, the City also objects to the requirement that all ventilation systems be balanced annually. (*See* Apr. 26, 2001 Order at 11). The City has proposed a less intrusive alternative, with which the detainees have agreed. (Pl. Br. at 64–65). In short, the City's proposal would require "Public Health Sanitarians [to]

spot check the air flow readings at the ventilation registers in 15% of the housing areas and the intake areas monthly, during normal inspection." (Def. Br. at 51). The district court shall consider amending its remedial orders to replace the annual balancing requirement with this proposal on remand.

appeal and dispute whether the standard is constitutional.

From our review of the record, we cannot be sure whether the need-narrowness-intrusiveness findings concerning the twenty foot-candle remedy were made because of the actual lighting conditions in the facilities, or because of the court's belief that the ten foot-candle standard violates the Constitution. The latter course would have been impermissible, as the Constitution does not mandate any particular foot-candle standard; it only places outside limits on actual lighting conditions.

We, therefore, vacate the court's twenty foot-candle requirement. On remand, the court should consider whether this requirement meets the PLRA's need-narrowness-intrusiveness findings in view of the actual conditions at the facilities. In making this determination, the court should consider the apparently significant lighting improvements the City has made since its most recent order. (*See* Def. Br. at 44–46 (discussing improvements)).

### e. Power washing

■ The district court found, and the City does not contest, unconstitutionally unsanitary conditions in various areas of the facilities. As one remedy, the court ordered that all showers be power washed with bleach quarterly. The City contends that this requirement will damage its newly renovated grouted-tile showers. It also contends that other remedial directives, such as the requirement that showers be "thoroughly cleaned and sanitized at least once daily," are sufficient to keep the showers in sanitary condition. (Apr. 26, 2001 Order at 8).

But, as the City acknowledges, since 1995 the DOC's own internal policies have required that showers be washed daily with sanitizing solution, and, as the district court observed, there is no evidence that this cleaning regimen "is equal to the task." *Benjamin IX,* 2002 WL 109610 at* 3, 2002 U.S. Dist. LEXIS 1228 at *8. We, therefore, find no error in the court's conclusion that stronger remedial measures were necessary and affirm the power-washing requirement. In its reply brief, the City discusses a pilot program involving the use of a stronger cleaning agent for its grouted-tile installations. It is certainly free to propose this program to the district court.

## IV. Termination of Prospective Relief

The district court concluded that certain conditions, even if not ideal, did not amount to current and ongoing constitutional violations and terminated prospective relief. The detainees appeal from three of these conclusions.

### a. Scalding hot water

■ The detainees contend that the district court erroneously concluded that plumbing conditions at the facilities were within constitutional limits. In particular, they assert that they are exposed to scalding hot water in showers and sinks, which presents an unconstitutional threat to their safety. The district court rejected this contention, finding that although some showers did provide water that was either too hot or too cold, this problem was insufficiently pervasive to amount to a constitutional violation. Since our review of the record supports the conclusion that such problems were isolated, we affirm the district court's finding that the plumbing conditions are not unconstitutional.

### b. Sanitation in food areas

■ The district court found that sanitary practices regarding food storage and preparation were adequate. The detainees contend that the court's analysis was insuf-

ficiently specific and that, had it engaged in a facility-by-facility analysis, it would have found the practices constitutionally inadequate at three facilities: AMKC, ARDC, and GMDC. Conditions there allegedly exposed prisoners to "food contaminated by vermin, food contaminated by leaking refrigerator and freezer condensers, food contaminated by fecal contaminants due to inadequate hand washing practices, and food contaminated by dirty equipment and pooled water." (Pl. Br. at 73).

Because the PLRA requires the court to make particular findings only when it identifies constitutional violations, it is to be expected that a court's discussion of conditions it finds not to violate the Constitution may be somewhat more cursory. But with respect to food-service sanitation, the court departed from its typical practice of considering individual institutions and, instead, considered them in the aggregate. After observing that both experts had noted numerous deficiencies at the institutions, the court stated that

> only a few deficiencies could be classified as "critical" and they were confined to the kitchens and food storage areas of ARDC, AMKC, GMDC, GRVC, JATC, and QHD. The remainder of the Department's prisons did not register a single "critical" violation.

*Benjamin VI*, 161 F.Supp.2d at 174.

The record does not support the conclusion that the parties' experts found only a "few" critical violations, unless the court thought such violations "few" relative to all the food service areas at all the facilities.[24] But considering facilities in the aggregate

was problematic: that some inmates are subjected to sub-constitutional conditions is not erased by the fact that others are not. In its discussion of vermin infestation, the court noted "a significant vermin problem" at several of the same facilities with numerous critical violations, including AMKC, ARDC, and GRVC. *Id.* at 173. At the conclusion of its discussion of vermin infestation, the court stated that it would "discuss[ ] below" the "concern of vermin infestation in food storage and preparation areas." *Id.* at 174. In fact, after discussing various other points in detail, the court did not return to the issue of vermin.

The record is replete with evidence of high levels of vermin activity in the food storage and service areas in the three facilities with which the detainees are primarily concerned, a problem which the City's own expert acknowledges. The record is also replete with evidence of other unsanitary conditions at other facilities. The district court appears to have placed great weight on Director Feeney's testimony that, in her eight years with the department, "not one pre-trial detainee has suffered a reportable incident of a foodborne illness." *Id.* But this testimony was an insufficient basis on which to discount the uncontroverted evidence of serious sanitary problems in the food service areas at AMKC, ARDC, and GMDC. "[A] remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The court should have considered whether the conditions at these three facilities posed an imminent threat.[25] Accordingly, we vacate its finding of no constitutional violation and remand for

---

24. At a single inspection of ARDC, the City's own expert found ten critical violations, including that the food storage area was "roach and mouse infested."

25. The court also cited an OCC report finding near total compliance with Directive 3902, concerning food-service sanitation. *Benjamin VI*, 161 F.Supp.2d at 174. But this report concerned only six institutions and did not include AMKC, ARDC, and GMDC.

particularized findings concerning the food-service areas in AMKC, ARDC, and GMDC.

### c. Vermin infestation in residential areas

■ Despite acknowledging significant vermin problems at AMKC, ARDC, BKHD, and GRVC, the court found "vermin infestation in the residential portion of the facility" only at AMKC. *Benjamin VI,* 161 F.Supp.2d at 173–74. But it found that the problem at AMKC was assuaged by the recent introduction of an Integrated Pest Management ("IPM") Program. The detainees contend that the court's findings of no vermin infestation are unsupported by the record and that the court should not have considered the IPM Program, since it was unclear whether it would be properly implemented.

■ Although the detainees are correct that, when considering whether to terminate relief, courts should generally assess "a record reflecting conditions as of the time termination is sought," *Benjamin III,* 172 F.3d at 166, this record may include "bona fide steps that prison officials are taking to alleviate poor prison conditions," *Hoptowit v. Ray,* 682 F.2d 1237, 1247 (9th Cir.1982). *See also Helling,* 509 U.S. at 36–37, 113 S.Ct. 2475 (noting that voluntary remedial steps may bear on deliberate indifference inquiry). The district court was convinced that the implementation of the IPM Program obviated a finding that a constitutional violation was present at AMKC, and we see no reason to disturb this conclusion. Moreover, we believe the record supports the court's conclusion that vermin activity was not present to an unconstitutional extent at any of the facilities.

### CONCLUSION

We therefore affirm the district court's orders in full, except we vacate its (a) bed-spacing remedy; (b) twenty foot-candle lighting requirement; and (c) finding that the food-service areas at AMKC, ARDC, and GMDC are constitutionally adequate. We also direct the court to consider amending its remedial orders to substitute the requirement that ventilation systems be annually balanced in favor of the alternative agreed upon by the parties, and we remand for further proceedings consistent with this opinion.